PD-0019-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/24/2015 10:50:13 PM
Accepted 7/27/2015 8:17:47 AM
ABEL ACOSTA
CLERK

# COURT OF CRIMINAL APPEALS

## PD-0019-15, PD-0020-15
## PD-0021-15, PD-0022-15

FILED IN
COURT OF CRIMINAL APPEALS

July 27, 2015

ABEL ACOSTA, CLERK

### *State of Texas, Appellant,*
### *v.*
### *Albert G. Hill, III, Appellee.*

On Discretionary Review from
Nos. 05-13-00421-CR, 05-13-00423-CR
05-13-00424-CR, and 05-13-00425-CR
Fifth Court of Appeals, Dallas

On Appeal from Nos. F11-00180, F11-00182,
F11-00183, and F11-00191
204th District Court, Dallas County

# Appellee's Opening Brief

Michael Mowla
445 E. FM 1382 No. 3-718
Cedar Hill, Texas 75104
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Appellee
and Lead Counsel

L.T. (Butch) Bradt
14015 S.W. Freeway Ste. 4
Sugar Land, Texas 77478
Phone: 281-201-0700
Fax: 281-201-1202
ltbradt@flash.net
Texas Bar No. 0284160
Attorney for Appellee

George R. Milner III
2828 N. Harwood St. Suite 1950
Dallas, Texas 75201
Phone: 214-651-1121
Fax: 214-953-1366
ItsRainingII@aol.com
Texas Bar No. 00784611
Attorney for Appellee

## *ORAL ARGUMENT GRANTED*

## I. Identity of Parties, Counsel, and Judges

Albert G. Hill, III, Appellee

Michael Mowla, attorney for Appellee at trial, on appeal, and on discretionary review (lead)

George R. Milner III, attorney for Appellee at trial, on appeal, and on discretionary review

Leonard Thomas (Butch) Bradt, attorney for Appellee on discretionary review

Marshall A. Camp, attorney for Appellee at trial and appeal *pro hac vice*

John C. Hueston, attorney for Appellee at trial and appeal *pro hac vice*

Alison L. Plessman, attorney for Appellee at trial and appeal *pro hac vice*

State of Texas, Appellant

Charles "Chad" Baruch, attorney pro tem

Susan Hawk, Dallas County District Attorney (office recused on own motion)

Lori Ordiway, Dallas County Assistant District Attorney, attorney for State of Texas

Michael Casillas, Dallas County Assistant District Attorney, attorney for State of Texas

Lisa Smith, Dallas County Assistant District Attorney, attorney for State of Texas

Craig Watkins, (former) Dallas County District Attorney, attorney for State of Texas

Russell Wilson, (former) Dallas County Assistant District Attorney, attorney for State of Texas

Heath Harris, (former) Dallas County Assistant District Attorney, attorney for State of Texas

Judge Lena Levario, Presiding Judge of the 204th Judicial District Court (at the time of trial)

Judge Tammy Kemp, Presiding Judge of the 204th Judicial District Court (present)

Justice David Bridges (Dissenting), Fifth Court of Appeals

Justice Michael O'Neill, Fifth Court of Appeals

Justice Ada Brown, Fifth Court of Appeals

## II. Table of Contents

I.     Identity of Parties, Counsel, and Judges..............................................2

II.    Table of Contents..............................................................................4

III.   Table of Authorities ..........................................................................8

IV.   Appendix Index .................................................................................11

V.    Statement of the Case and Procedural History .................................12

VI.   Statement Regarding Oral Argument ................................................18

VII.  Issues Presented ...............................................................................19

VIII. Facts ................................................................................................20

    1.  Watkins's "investigation" of Appellee...........................................20

    2.  Fee dispute between Blue and Appellee..........................................21

    3.  Trustee for Hill Jr.'s trust contacts Martin .....................................22

    4.  Communications between Blue and Watkins during the lead-up
       to the indictments.........................................................................22

    5.  On March 31, 2011, two weeks before beginning of the fee
       dispute trial between Appellee and Blue, the indictments are
       returned against Appellee ...............................................................26

    6.  On April 11, 2011, Blue makes another "contribution" to
       Watkins .........................................................................................26

    7.  Fee dispute trial between Appellee and Blue ..................................26

    8.  Appellee files the *Motion to Dismiss* and proffers 45 exhibits and
       416 pages of evidence in support of the motion..............................27

    9.  The lead-up to the hearing held on February 14, 2013 ..................31

    10. Hearing on February 14, 2013 – trial court rules that Appellee
       made a *prima facie* showing on each of his claims and was
       entitled to an evidentiary hearing concerning whether Watkins
       was influenced by Blue with respect to the decision to approve
       the indictments of Appellee and his wife ........................................32

    11. Between March 1 and 6, 2013, the State files for mandamus in
       the Court of Appeals and this Court, all of which are denied .........33

    12. Hearing on March 7, 2013 – trial court draws an adverse
       inference and dismisses the indictments against Appellee...............34

13. The trial court's findings and dismissal of the indictments against Appellee ..................................................................................................38

IX.    Summary of the Arguments.........................................................................40

X.    Argument ....................................................................................................42

1. Issue One: To establish a *prima facie* case of selective prosecution in violation of the Fifth and Fourteenth Amendments, and to obtain a hearing under the "presumption of prosecutorial vindictiveness" method, a defendant must provide "some evidence" that shows: (1) the government singled out the defendant for prosecution and has not proceeded against others similarly situated based on the type of conduct for which the defendant is charged; and (2) the government's discriminatory selection is invidious. Once the defendant makes this showing, the burden shifts to the State to justify the discriminatory treatment.

Appellee asks this Court to clarify what constitutes "some evidence" and hold that so long as a defendant attaches a proffer of evidence to a motion to dismiss due to prosecutorial misconduct, the trial court in its discretion determines to present a colorable claim of a constitutional violation, the defendant has attached "some evidence," and the trial court should have the discretion to conduct a hearing on the motion to dismiss. Appellee also asks this Court to find that Appellee not only attached "some evidence" showing a constitutional violation, but in fact attached "exceptionally clear evidence."

Finally, Appellee asks this Court to find that the Court of Appeals erred when it: (1) sustained the State's second issue and concluded that Appellee "did not make the proper showing sufficient to establish a *prima facie* case..." of the fact that the former elected district attorney of Dallas County engaged in prosecutorial misconduct by allowing himself to be corruptly influenced by a political ally in return for indicting Appellee; (2) found that the trial court erred in conducting a hearing on Appellee's motion to dismiss based upon prosecutorial misconduct; (3) vacated the trial court's *Order Granting Motion to Dismiss*; and (4) remanded the case to the trial court to reinstate the indictments against Appellee. ....................................42

**i.** Introduction – so long as the prosecution is not for an improper purpose, prosecutors have the discretion to prosecute ..........................................................................42

**ii.** To raise a "presumption of prosecutorial vindictiveness," a defendant must present evidence of circumstances that pose a "realistic likelihood" of misconduct. When the defendant does so, the defendant makes a *prima facie* case. The burden then shifts to the State to rebut this presumption or face dismissal of the charges ....................................49

**iii.** The majority opinion's characterization of the evidence attached to the *Motion to Dismiss* is inaccurate. Nearly all of the evidence proffered by Appellee and attached to the *Motion to Dismiss*: (1) would be admissible in a hearing without further authentication; and (2) constitutes "exceptionally clear" evidence that the decision to prosecute was for an improper purpose, exceeding the standard that the trial court must, in its discretion, find "some evidence" of a colorable claim of a constitutional violation ..............................................................................51

**iv.** "Some evidence" means that a defendant must attach to the motion to dismiss evidence that establishes that the defendant has a colorable claim of a constitutional violation. This allows the trial court to exercise its discretion in ordering the hearing. Once a hearing is held, the defendant must show by "exceptionally clear evidence" that the prosecution was initiated for an improper reason. ..............................................................58

**v.** No appellate court in Texas has ever ruled that a trial court erred in conducting a hearing on a defendant's motion to dismiss charges on the basis they violated his constitutional rights. ...................................................67

**vi.** Texas public policy benefits if trial courts are allowed discretion to determine whether a defendant has made the threshold showing of a colorable claim that the defendant is entitled to a hearing ...................................................68

**vii.** Most other courts have adopted standards substantially similar to the standard that Appellee argues this Court should adopt: that so long as a defendant attaches a proffer

6

of evidence to a motion to dismiss due to prosecutorial misconduct that the trial court in its discretion determines to present a colorable claim of a constitutional violation, the defendant has attached "some evidence," and the trial court should have the discretion to conduct a hearing on the motion to dismiss.............................................................71

**viii.** This Court should affirm the trial court's order dismissing the indictments because the evidence obtained during the March 7, 2013 hearing overwhelmingly proved that: (1) Watkins singled out Appellee for prosecution and has not proceeded against others similarly situated based on the type of conduct for which Appellee was charged; and (2) Watkins's discriminatory selection was invidious and resulted from allowing himself to be improperly influenced by Blue.............................................................76

**ix.** Conclusion.................................................................76

XI. Conclusion and Prayer...................................................78

XII. Certificate of Service....................................................80

XIII. Certificate of Compliance with Tex. Rule App. Proc. 9.4 ............80

## III. Table of Authorities

## Cases

*Attorney General of United States v. Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1172 (1983) ...................................75

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) .................................................43

*Brady v. Maryland*, 373 U.S. 83 (1963) ...........................................................68

*Brown v. Board of Education*, 347 U.S. 483 (1954) .........................................46

*Cates v. State*, 120 S.W.3d 352 (Tex. Crim. App. 2003) ............................ 55, 56

*County v. State*, 812 S.W.2d 303 (Tex. Crim. App. 1989) ...............................62

*Daniels v. State*, 754 S.W.2d 214 (Tex. Crim. App. 1988) ..............................63

*Dunlop v. Bachowski*, 421 U.S. 560 (1975) .....................................................44

*Ely v. State*, 582 S.W.2d 416 (Tex. Crim. App. 1979) .....................................63

*Fox v. State*, 418 S.W.3d 365 (Tex. App. Texarkana 2012) .............................53

*Franks v. Delaware*, 438 U.S. 154 (1978) .......................................................55

*Galvan v. State*, 988 S.W.2d 291 (Tex. App. Texarkana 1999) ........................68

*Garcia v. State*, 172 S.W.3d 270 (Tex. App. El Paso 2005) ............... 51, 61, 62, 68

*Gawlik v. State*, 608 S.W.2d 671 (Tex. Crim. App. 1980) ...............................43

*Gregg v. Georgia*, 428 U.S. 153 (1976) ..........................................................62

*Harm v. State*, 183 S.W.3d 403 (Tex. Crim. App. 2006) .................................69

*Harris v. State*, 227 S.W.3d 83 (Tex. Crim. App. 2007) .................................56

*Heckler v. Chaney*, 470 U.S. 821 (1985) .........................................................44

*Hinojosa v. State*, 4 S.W.3d 240 (Tex. Crim. App. 1999) ................................56

*Jones v. White*, 992 F.2d 1548 (11th Cir. 1993), *cert. denied*, 481 U.S. 1055 (1993) .....................................................................................................74

*McCleskey v. Kemp*, 481 U.S. 279 (1987) .......................................................63

*Moore v. Illinois*, 408 U.S. 786 (1972) ...........................................................69

*Moses v. State*, 105 S.W.3d 622 (Tex. Crim. App. 2003) ................................55

*Neal v. State*, 150 S.W.3d 169 (Tex. Code Crim. App. 2004) ..........................49

*Nelloms v. State*, 63 S.W.3d 887 (Tex. App. Fort Worth 2001, *pet. ref.*) .......................................................................................................................51

*Oyler v. Boles*, 368 U.S. 448 (1962) ..............................................................44

*Plessy v. Ferguson*, 163 U.S. 537 (1896) .......................................................45

*Ramsey v. State*, 579 S.W.2d 920 (Tex. Crim. App. 1979) ............................ 56, 57

*Rodriguez v. State*, 283 S.W.3d 465 (Tex. App. San Antonio 2009) .....................68

*State v. Dinur*, 383 S.W.3d 695 (Tex. App. Houston [14th Dist.] 2012,
    *no pet.*) ........................................................................................................68

*State v. Hill*, 05-13-00421-CR-180, 05-13-00423-CR-180, 05-13-
    00424-CR-180, and 05-13-00425-CR-180, 2014 Tex. App.
    LEXIS 13835 (Tex. App. Dallas, December 29, 2014) (Bridges,
    J. dissenting) (unpublished opinion)......................................................... passim

*Strickler v. Green*, 527 U.S. 263 (1999) .........................................................69

*United States v. Armstrong*, 48 F.3d 1508 (9th Cir. 1995)......................... 59, 60, 74

*United States v. Armstrong*, 517 U.S. 456 (1996) ...................................... 49, 55, 61

*United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974) ....................................72

*United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926) ............................43

*United States v. Fares*, 978 F.2d 52 (2d Cir. 1992)............................................71

*United States v. Goodwin*, 457 U.S. 368 (1982).......................................... 49, 58, 70

*United States v. Goulding*, 26 F.3d 656 (7th Cir. 1994), *cert.
    denied*, 513 U.S. 1061 (1994)......................................................................73

*United States v. Greenwood*, 796 F.2d 49 (4th Cir. 1986) ..................................73

*United States v. Heidecke*, 900 F.2d 1155 (7th Cir. 1990) ..................................74

*United States v. Johnson*, 577 F.2d 1304 (5th Cir. 1978)....................................75

*United States v. Mezzanatto*, 513 U.S. 196 (1995).............................................50

*United States v. P.H.E., Inc.*, 965 F.2d 848 (10th Cir. 1992) ...............................74

*United States v. Parham*, 16 F.3d 844 (8th Cir. 1993) .......................................75

*United States v. Peete*, 919 F.2d 1168 (6th Cir. 1990) .......................................73

*United States v. Penagaricano-Soler*, 911 F.2d 833 (1st Cir. 1990).......................71

*United States v. Schmucker*, 815 F.2d 413 (6th Cir. 1987) .................................73

*United States v. Torquato*, 602 F.2d 564 (3d Cir. 1979), *cert.
    denied*, 444 U.S. 941 (1979)........................................................................72

*Wayte v. United States*, 470 U.S. 598 (1985) ...................................................69

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................ 45, 46

**Statutes**

28 U.S.C. § 547 (2015) ...................................................................................43

Tex. Code Crim. Proc. Art. 2.01 (2015) ........................................................43

Tex. Code Crim. Proc. Art. 39.14 (2015) ......................................................68

Tex. Loc. Gov. Code § 201.003(8) (2013) ....................................................53

Tex. Pen. Code § 37.01(2)(A) (2015) ...........................................................53

**Other Authorities**

Black's Law Dictionary, 240 (7th ed. 1999) .................................................63

Concise Oxford American Thesaurus, 138, 292 (2006) .................................63

**Rules**

Tex. Rule App. Proc. 66.3 (2015) ..................................................................78

Tex. Rule App. Proc. 68.11 (2015) ................................................................80

Tex. Rule App. Proc. 68.4 (2015) ..................................................................18

Tex. Rule App. Proc. 9.4 (2015) ....................................................................80

Tex. Rule App. Proc. 9.5 (2015) ....................................................................80

Tex. Rule Evid. 801 (2013) ............................................................................53

Tex. Rule Evid. 803 (2013) ............................................................................53

Tex. Rule Evid. 804 (2013) ............................................................................53

**Constitutional Provisions**

U.S. Const. Art. II, § 3 ...................................................................................43

**IV. Appendix Index**

**Appendix 1:** *State v. Hill*, 05-13-00421-CR-180, 05-13-00423-CR-180, 05-13-00424-CR-180, and 05-13-00425-CR-180, 2014 Tex. App. LEXIS 13835 (Tex. App. Dallas, December 29, 2014) (Bridges, J. dissenting) (unpublished opinion)

**To The Honorable Judges of the Court of Criminal Appeals:**

Appellee Albert G. Hill, III respectfully submits this opening brief:

## V. Statement of the Case and Procedural History

Appellee asks that this Court review the judgment and opinion of the Fifth Court of Appeals in *State v. Hill*, 05-13-00421-CR-180, 05-13-00423-CR-180, 05-13-00424-CR-180, and 05-13-00425-CR-180, 2014 Tex. App. LEXIS 13835 (Tex. App. Dallas, December 29, 2014) (Bridges, J. dissenting) (unpublished opinion). (*See* Appendix 1). The issues presented in this case appear to be of first impression in Texas. Appellee found no other case in which a defendant proffered "some evidence" – much less "exceptionally clear evidence" as proffered in this case – showing that in exchange for indicting the defendant, a prosecutor was improperly influenced by a person to the extent that the defendant's constitutional rights were violated. Here, this person, who was at the time of indictment involved in civil litigation with the defendant, improperly influenced the prosecutor. When that person and the prosecutor refused to answer any questions at a hearing that the trial court had the discretion to order, the trial court made an adverse inference, and dismissed the indictments due to prosecutorial misconduct. But, the Court of Appeals reversed the trial judge's ruling on the basis that the defendant did not proffer enough evidence to even warrant a hearing.

The procedural history is as follows: on March 31, 2011, four indictments were returned against Appellee, alleging violations of Texas Penal Code § 32.32, False Statement to Obtain Credit: that on or about May 14, 2009, with the intent of obtaining a loan of money, the aggregate value of which was $200,000.00 or more, Appellee made certain materially false and misleading written statements to OmniAmerican Bank by: (1) claiming that he and his wife, Erin Hill, "were only owners of real property located at 4433 Bordeaux, Highland Park, Dallas County, Texas..." (F11-00180/05-13-00421-CR) (CR-180, 6, 427);[1] (2) claiming that his gross monthly income was $54,341.00 (F11-00182/05-13-00423-CR) (CR-180, 428); (3) executing certain documents "by deception" by creating and executing the documents and by creating and confirming by words and conduct false impressions of facts that were "likely to affect the judgment of OmniAmerican..." that Appellee did not believe to be true (F11-00183/05-13-00423-CR) (CR-180, 429); and (4) that his Inwood National Bank account contained $102,174.00 (F11-00191/05-13-00424-CR) (CR-180, 430). *See* Tex. Pen. Code § 32.32 (2009).

After conducting his own investigation, Appellee uncovered compelling circumstantial evidence that Lisa Blue, a Democratic Party operative and attorney –

---

[1]The Clerk's Record (three unsealed and two sealed volumes, three supplemental volumes, and a supplemental sealed volume) is cited as "CR" followed by the last three digits of the cause number for the three volumes (or "-Supp-Aug02"), followed by the page number. The Reporter's Record (five volumes) is cited as "RR" following by the volume number and page number, or the exhibit number of the exhibits volume (RR5) followed by the "PDF" page number of RR5.

who at the time was involved in civil litigation against Appellee over a fee dispute – corruptly influenced then-Dallas County District Attorney Craig Watkins ("Watkins"),[2] who in turn authorized obtaining the four indictments against Appellee. Appellee filed a *Motion to Quash and Dismiss the Indictment Due to Prosecutorial Misconduct* ("*Motion to Dismiss*"). (CR-180, 31-488). The *Motion to Dismiss* alleged that Appellee's constitutional rights to due process and equal protection were violated due to Blue's corruptly influencing Watkins, and as a result, Appellee was: (1) selectively prosecuted; (2) vindictively prosecuted; and (3) deprived of his right to a disinterested prosecutor. (CR-180, 32-67). At the time that the indictments were returned against Appellee, Blue and Appellee were embroiled in a fee dispute litigation before the United States District Court, Northern District of Texas, in which Blue was seeking over $50 million. (RR2, 20-21; CR-180, 32-34).

Based on the evidenced proffered by Appellee that was attached to the *Motion to Dismiss*, on February 14, 2013, the trial court found that Appellee was entitled to a hearing. (RR2, 28). The trial court required Appellee to first question Blue. (RR2, 28-30). After Blue invoked her Fifth Amendment privilege against self-

---

[2] On November 4, 2014, Watkins was the only democrat to lose a county-wide election in Dallas County. *See Susan Hawk ousts Craig Watkins in heated race for Dallas County DA*, http://www.dallasnews.com/news/politics/local-politics/20141105-susan-hawk-ousts-craig-watkins-in-heated-race-for-dallas-county-da.ece, last accessed on July 17, 2015.

incrimination, which prevented Appellee from obtaining the information by other means, Appellee was permitted to call Watkins as a witness. (RR2, 47-49). The trial court ordered an evidentiary hearing on the limited question of Blue's influence on Watkins's decision to pursue indictments against Appellee, so that the scope of Appellee's questioning of Watkins would be limited to Watkins's conversations with Blue. (RR2, 27-28, 47-49). The questioning of Watkins did not take place during the February 14, 2013 hearing because Watkins claimed through counsel that although he was in the courthouse, he suddenly became "ill" and thus could not testify. (RR2, 54-64).

Arguing that Appellee was not entitled to an evidentiary hearing, the State sought mandamus relief and a stay of the hearing from the Fifth Court of Appeals of Dallas and from this Court.[3] The State's petitions for writs of mandamus were denied. On March 7, 2013, the evidentiary hearing was held. (RR3).

During the evidentiary hearing on March 7, 2013, the State admitted that the home-equity loan (which was the subject of the indictments) was never in arrears, had been fully repaid before the commencement of any criminal investigation, and that the indictments against Appellee are "unprecedented." (RR4, 49, 126, 129,

---

[3] Appellee asks this Court to take judicial notice of the fact that on March 1, 2013, the State filed for mandamus relief in the Fifth Court of Appeals in Cause Numbers 05-13-00298-CV, 05-13-00299-CV, 05-13-00300-CV, 05-13-00301-CV, and 05-13-00302-CV; and again on March 6, 2013 in this Court in Cause Number WR-79,189-01.

15

155).  Watkins made a blanket assertion of privilege and work product protection, and refused to answer any questions. (RR4, 15-17). The trial court overruled Watkins's objections, and further found that the State had waived privilege with respect to the issues before the court. (RR4, 16-17).

After Watkins refused to testify, Appellee examined several assistant district attorneys.  (RR4, 34-189).  After this testimony, the trial court gave Watkins another opportunity to testify, and he again refused. (RR4, 195).

The trial court found that Watkins's refusal to testify denied Appellee "his right to have a meaningful hearing" on his *Motion to Dismiss*.  (RR4, 219).  The trial court also found that the State failed to rebut Appellee's *prima facie* showing of prosecutorial misconduct. (RR4, 219).

On March 7, 2013, the 204th District Court dismissed with prejudice ("*Order Granting Motion to Dismiss*") the four indictments against Appellee under cause numbers F11-00180, F11-00182, F11-00183, and F11-00191. (RR4, 219; CR-180, 1100; CR-182, 978; CR-183, 977; CR-191, 894).

The State appealed the *Order Granting Motion to Dismiss* to the Court of Appeals.  The State raised four issues. The second issue raised by the State was "Whether the trial court abused its discretion by granting Appellee an evidentiary hearing—and then dismissing the indictments—where the facts he alleged failed to establish any constitutional violation."  *See Hill*, 2014 Tex. App. LEXIS 13835.

On December 29, 2014, the Court of Appeals: (1) sustained the State's second issue and concluded that Appellee "did not make the proper showing sufficient to establish a *prima facie* case..." of the fact that the former elected district attorney of Dallas County engaged in prosecutorial misconduct by allowing himself to be corruptly influenced by a political ally in return for indicting Appellee; (2) found that the trial court erred in conducting a hearing on Appellee's motion to dismiss based upon prosecutorial misconduct; (3) vacated the trial court's March 7, 2013 order granting Appellee's motion to dismiss; and (4) remanded the case to the trial court to reinstate the indictments against Appellee. *Hill*, *id.* at *36-38.

On February 23, 2015, Appellee filed a petition for discretionary review, which was granted on June 10, 2015. Appellee now presents the following Opening Brief.

## VI. Statement Regarding Oral Argument

Oral argument has been allowed, and Appellee requests oral argument. *See* Tex. Rule App. Proc. 68.4(c) (2015). As explained in the petition for discretionary review, and provided in greater detail below, the issues presented in this petition may be issues of first impression. As a result, Appellee believes that this Court's decisional process will be significantly aided by oral argument.

## VII. Issues Presented

**Issue One:** To establish a *prima facie* case of selective prosecution in violation of the Fifth and Fourteenth Amendments, and to obtain a hearing under the "presumption of prosecutorial vindictiveness" method, a defendant must provide "some evidence" that shows: (1) the government singled out the defendant for prosecution and has not proceeded against others similarly situated based on the type of conduct for which the defendant is charged; and (2) the government's discriminatory selection is invidious. Once the defendant makes this showing, the burden shifts to the State to justify the discriminatory treatment.

Appellee asks this Court to clarify what constitutes "some evidence" and hold that so long as a defendant attaches a proffer of evidence to a motion to dismiss due to prosecutorial misconduct, the trial court in its discretion determines to present a colorable claim of a constitutional violation, the defendant has attached "some evidence," and the trial court should have the discretion to conduct a hearing on the motion to dismiss. Appellee also asks this Court to find that Appellee not only attached "some evidence" showing a constitutional violation, but in fact attached "exceptionally clear evidence."

Finally, Appellee asks this Court to find that the Court of Appeals erred when it: (1) sustained the State's second issue and concluded that Appellee "did not make the proper showing sufficient to establish a *prima facie* case..." of the fact that the former elected district attorney of Dallas County engaged in prosecutorial misconduct by allowing himself to be corruptly influenced by a political ally in return for indicting Appellee; (2) found that the trial court erred in conducting a hearing on Appellee's motion to dismiss based upon prosecutorial misconduct; (3) vacated the trial court's Order Granting Motion to Dismiss; and (4) remanded the case to the trial court to reinstate the indictments against Appellee.

## VIII. Facts

### 1. Watkins's "investigation" of Appellee

On February 18, 2010, in a civil case in which Appellee and his father (Hill Jr.) were opposing parties, a United States district judge signed an order finding that Hill Jr.: (1) submitted summary judgment materials in bad faith and with the intent of committing fraud on the Court, and (2) lied under oath. (RR5, DX-1, 100). The federal judge also found that Hill Jr.'s attorney had "far exceeded the bounds of advocacy, permissible or otherwise." (RR5, DF-PT-3, 100).

Days later, on February 22, 2010, alleging that Appellee had committed mortgage fraud in connection with a home equity loan he had obtained from OmniAmerican, Hill Jr.'s attorney submitted a written complaint to Donna Strittmatter, head of the Specialized Crime Division of the Dallas County District Attorney's Office. (RR4, 75-76; RR5, SX-1, 8-66). Hill Jr. alleged that Appellee misrepresented his ownership interest in his primary residence that was used as collateral for the loan because at the time, the residence had been 80% owned by a trust of which both Appellee and Hill Jr. are beneficiaries. (RR4, 87-88; RR5, SX-1, 8). Strittmatter and assistant district attorney Stephanie Martin obtained permission to conduct an investigation of this allegation from First Assistant District Attorney Terri Moore. (RR4, 44-45).

Blue claims that in May 2010, while she was representing Appellee, in response to a story in D Magazine suggesting that the District Attorney's Office was

investigating Appellee and his wife concerning the loan from OmniAmerican, Blue met with Moore. (RR4, 46-47; CR-180, 854-855; CR-182, 178; CR-183, 178; CR-191, 177). In an effort to persuade the District Attorney's Office to abandon its investigation of Appellee, Blue presented Moore with a copy of the federal court order that found that Hill Jr. committed perjury. (RR4, 46-47; RR5, DX-1, 97-103. Moore did not confirm or deny whether the office was investigating Appellee. (RR4, 47:11–13). However, after meeting with Blue, Moore provided Martin and Strittmatter a copy of the federal court order and told them that Hill Jr. could not be used as a witness in the State's case. (RR4, 48).

### 2. Fee dispute between Blue and Appellee

On July 7, 2010, after: (1) Appellee rejected a $30 million fee for Blue and two other attorneys associated with her (Aldous and Malouf), and (2) United States Magistrate Judge Paul Stickney rejected the fee recommendation, Blue filed a motion to withdraw from representing Appellee in the federal civil case, and became Appellee's adversary in a civil fee dispute. (CR-180, 678-682; CR-182, 586-587; CR-183, 585-586).

Shortly after the global settlement agreement and final judgment were entered in the federal civil proceeding between Appellee and Hill Jr., on December 7, 2010, Blue and her associated attorneys filed a complaint in federal court against Appellee

and his wife, seeking to recover over $50 million on the settlement. (RR5, DX-1, 117-123, 139, 408).

### 3. Trustee for Hill Jr.'s trust contacts Martin

On September 8, 2010, about seven months after Hill Jr.'s attorney submitted the complaint to the District Attorney's Office, the trustee for the Hill Jr. trust, contacted Martin by phone and in writing, urging Martin to pursue indictments against Appellee and his wife. (RR4, 145-147). Martin's handwritten notes reflect that she told Mr. Pickett that OmniAmerican "...really isn't interested in prosecuting," and that she "didn't see how [she] could prove his criminal case," especially since the "victim" (OmniAmerican) suffered no harm and did not want to prosecute. (RR4, 183-185, 201; RR5, DX-8; 1084). After her discussion with Pickett, Moore directed Martin to move forward with the investigation. (RR4, 186-187, 191; RR5, DX-8, 1084).

### 4. Communications between Blue and Watkins during the lead-up to the indictments

On January 7, 2011, about one month after filing the $50-million-plus fee dispute suit against Appellee, Blue met with Watkins. (RR5, DX-4, 1075-1076).

On or about January 12, 2011, Martin conducted a "pitch session" regarding the investigation against Appellee and his wife, to determine whether the State should seek indictments against Appellee and his wife. (RR4, 35-36, 120-125, 166). Watkins, Moore, and Strittmatter all attended the pitch session, during which

Watkins asked a number of questions, gave his opinion regarding the real estate title issues at the center of the allegations against Appellee and his wife, and even suggested additional charges Martin should consider bringing against Appellee and his wife. (RR4, 163:3–7, 163:15–165:19).

A few days later, on January 15, 2011, Blue again met with Watkins. (RR5, DX-4, 1025).

Two days later, on January 17, 2011, Blue and associated attorneys entered into a written agreement with Appellee and his wife to litigate the fee dispute in federal court in early April 2011. (RR5, DX-1, 141-144).

On January 20, 2011, three days later, Blue met Watkins for dinner, which was paid for by Blue. (RR5, DX-3; DX-4, 1019, 1077-1078).

The next morning, on January 21, 2011, Blue called Watkins at 10:51 a.m. (RR5, DX-1, 386, 426). Watkins returned Blue's call at 10:54 a.m., which was answered by Blue in the presence of associated attorney Malouf. (RR5, DX-1, 395-397, 426). Under oath, Blue admitted that during this call, Watkins raised the topic of indicting Appellee and his wife, saying "there could be an indictment or are you still interested in the indictments," and Blue claims to have told Watkins that she could not talk to him about Appellee and his wife. (RR5, DX-1, 171-174). However, Blue's telephone records show she called Watkins back at 11:13 a.m. on the same day, and they had another conversation lasting six minutes. (RR5, 426).

23

Blue called Watkins several more times between March 3 and 10, 2011. (RR5, DX-1, 361-364, 426). Blue also met with Watkins on March 3, 2011 to take publicity photos in connection with a $100,000 donation Blue made to SMU Law School in 2010 in Watkins's honor. (RR5, DX-3, DX-4, 995, 1025).

Despite the fact that Watkins was not running for office, and in fact in November 2010 had been reelected and would not face another election until 2014, on March 9, 2011, Blue held a campaign fundraiser for Watkins at her home. (RR5, DX-4, 1031-1047, 1079-1080). Blue's invitations encouraged the invitees to donate to Watkins because it was going to be a "tight race." (RR5, DX-4, 1031-1047, 1079-1080). Blue personally contributed $5,000 to Watkins, and raised thousands of dollars from other donors. (RR5, DX-2, 872-890).

On March 22 and 24, 2011, Blue contacted Watkins while attending depositions, including her own, in connection with the fee dispute with Appellee. (RR5, DX-1, 279-280, 301-302, DX-4, 157, 368-369, 377, 390-391, 426, 1025).

Without question, Watkins had the ultimate authority to determine whether Appellee and his wife would be indicted. (RR4, 43:10–14, 191:13–18). Watkins was the final decision-maker, and the indictments would not have been presented to the grand jury without his approval. (RR4, 166, 191).

Watkins approved the presentation of the case against Appellee and his wife to the grand jury. (RR4, 163, 166). As a result, on March 29, 2011, about two weeks

24

before the fee trial between Appellee and Blue was set to begin, Martin presented the case against Appellee and his wife to the grand jury. (RR4, 167; RR5, SX-4, 85-88). That same night, Watkins sought to meet Blue for drinks. (RR5, DX-3, DX-4, 1012, 1025-1026). The following night, Watkins and Blue met for dinner at an upscale restaurant in Dallas. (RR5, DX-3, DX-4, 1012, 1025-1026, 1081-1082).

Blue admitted in her deposition in the fee dispute litigation with Appellee that Watkins called her and raised the subject of the indictments of Appellee and his wife at least one time after the January 21, 2011 phone call. (RR5, DX-1, 175-176). Blue placed numerous calls to numbers associated with Watkins, in addition to the call on January 21, 2011. Blue's phone records also indicate that she received one telephone call from Watkins's cell phone, on the evening of March 30, 2011 – the same night she had dinner with Watkins at the Dallas restaurant, and one day after the cases were presented to the grand jury. (RR5, DX-1, 344, 371-372, 386, 426-427)

In pleadings, the State claims that Watkins may have discussed the impending indictments with Blue for the purposes of furthering the investigation. (CR-180, 625-626; RR2, 52-53). Although the State also took the position that Watkins had no role in the investigation (RR3, 24; RR4, 214), Watkins continued to discuss indictments with Blue **after** the charges had been presented to the grand jury. (RR5, DX-1, 175-176).

**5. On March 31, 2011, two weeks before beginning of the fee dispute trial between Appellee and Blue, the indictments are returned against Appellee**

About two weeks before the scheduled start of the fee dispute trial between Appellee and Blue, the indictments against Appellee and his wife were returned on March 31, 2011, and made public on April 4, 2011. (RR5, DX-1, 141, 146-147; CR-180, 162; CR-182, 158; CR-183, 158; CR-191, 157).

**6. On April 11, 2011, Blue makes another "contribution" to Watkins**

Nine days after the indictments against Appellee were returned, and four days after the indictments were made public, on April 8, 2011, Blue contacted Watkins's wife and Watkins's assistant for the purpose of delivering an additional $1,000 "contribution" to Watkins. (RR5, DX-4, 1026). This "contribution" occurred five months after Watkins had been reelected district attorney. Blue had no further telephone communications with Watkins until the evening of April 27, 2011, when Blue called Watkins shortly after she testified at trial in the fee dispute against Appellee. (RR5, DX-1, 427).

**7. Fee dispute trial between Appellee and Blue**

After Appellee was indicted, he moved to stay his fee dispute trial against Blue and her associated attorneys until the criminal charges were resolved. (RR5, DX-1, 406-411). Blue objected to the stay, and the district court granted a two-day continuance. (RR5, DX-1, 410). The district court trial on Blue's claims against Appellee took place between April 20, 2011 and April 28, 2011. Due to the criminal

charges, Appellee and his wife exercised their Fifth Amendment privilege and did not testify during the fee-dispute trial. (RR5, DX-1, 415-416, 421). On December 31, 2011, the federal district court awarded Blue and her associated attorneys $21,942,961.00 in attorney's fees, of which Blue was entitled to one-third, or approximately $7.3 million. (RR5, DX-1, 106, 128).

8. **Appellee files the *Motion to Dismiss* and proffers 45 exhibits and 416 pages of evidence in support of the motion.**

On November 16, 2012, Appellee filed the *Motion to Dismiss*, asserting his constitutional rights to Due Process and Equal Protection were violated because, due to Blue's bribing and influence of Watkins, Appellee was: (1) selectively prosecuted; (2) vindictively prosecuted; and (3) deprived of his right to a disinterested prosecutor. (CR-180, 31-488). Attached to the *Motion to Dismiss* and proffered to the court were 45 exhibits and 416 pages of evidence. (CR-180, 72-488). The proffered evidence includes the following (CR-180, 36-488):

- The case against Appellee was referred to the District Attorney's Office by the attorney for Hill Jr., who is an adverse party to Appellee in a federal lawsuit.

- On February 18, 2010, a judge in the United States District Court, Northern District of Texas, entered an order finding that Hill Jr.: (1) submitted summary judgment materials in bad faith and with the intent of committing fraud on the Court, and (2) lied under oath. The district court also found that Hill Jr.'s attorney had "far exceeded the bounds of advocacy, permissible or otherwise."

27

- Four days later, on February 22, 2010, Hill Jr.'s father submitted a letter to the district attorney's office in which he accused Appellee and his wife of mortgage fraud.

- A few months later, Tillotson, the partner of Hill Jr.'s attorney, donated nearly $50,000 to Watkins's reelection campaign. Neither Tillotson nor other members of his firm previously contributed to Watkins's campaigns, but the contributions immediately made Tillotson one of Watkins's largest individual contributors.

- The mortgage fraud allegations were dubious at best because the home equity loan obtained by Appellee was never in default, was repaid in full just a few months after it was obtained, long before Watkins considered criminal charges against Appellee and was fully secured at all times by Appellee's undisputed equity in the subject home.

- OmniAmerican did not suffer any loss, was never at risk of suffering any loss, and never complained to authorities that Appellee did anything wrong or committed any crime.

- The District Attorney's Office did not interview witnesses such as the loan officer or the mortgage broker, before indicting Appellee.

- Despite the District Attorney's Office's policy that defense attorneys would be provided notice of grand jury proceedings and an opportunity to present their case to the grand jury, no such notice was given to Appellee or his attorneys. In fact, First Assistant Moore, who was a witness during the motion to dismiss hearing, told Texas Lawyer that it was "all about fairness... This is not a railroad we are running...this is a justice system."

- Beginning in November 2009, Appellee was represented for about six months in the federal litigation by a group of attorneys that included Blue. Blue bragged to Appellee about her relationship with Watkins, and specifically told Appellee about her personal friendship with Watkins, generous campaign contributions Blue gave to Watkins, and pro bono representation of Watkins as his personal lawyer.

- While representing Appellee, Blue even discussed ways she might use her influence with Watkins to intimidate opposing counsel in the federal litigation.

- Shortly after the federal litigation settled in May 2010, Blue and the two attorneys with whom she represented Appellee demanded $50 million in attorney's fees for six months of work. When Appellee refused, Blue and the other attorneys withdrew from representing him and filed suit against Appellee for their fees.

- Two weeks before this fee dispute trial was set to begin in federal court on April 18, 2011, Appellee learned that he had been indicted.  As a result of the indictments, Appellee was advised to not take the stand during the fee dispute trial.

- The federal court entered a judgment against Appellee and his wife for more than $34 million, which was later reduced to $21.9 million, with Blue personally standing to receive one-third of the judgment, or about $7.3 million.

- Appellee then obtained discovery from Blue regarding her communications with the District Attorney's Office.  During a deposition, Blue admitted that Watkins had called her before the indictments were returned to attempt to discuss potential charges against Appellee. Blue stated that Watkins told her that "there could be an indictment or are you still interested in the indictments," or words to that effect.

- Through the discovery, it was revealed that a dramatic spike in communications between Blue and Watkins occurred in the days and weeks before the indictments were obtained.  These communications included calls between Blue and both Watkins's office and cellphone numbers.

- On March 30, 2011, the day before indictments against Appellee were presented to the grand jury, Blue and Watkins communicated seven times via Watkins's cellphone number.

- Campaign finance records reflect that on March 9, 2011, which was about three weeks before the indictments were presented, the Watkins campaign accepted a $5,000 donation from Blue.  This was despite the fact that

Watkins's "reelection campaign" had ended months earlier (Watkins had been reelected in November 2010).

- Around the same time, Blue solicited others who donated thousands more to Watkins.

- About 18 months after Appellee was indicted, on October 12, 2012, Appellee's counsel met with assistant district attorney Deborah Smith, who took over the cases against Appellee long after the indictment. Smith described a "re-evaluation" of the cases, and said that she had already determined that she would recommend dismissing certain charges against both Appellee and his wife (who was also indicted). Smith also told Appellee's counsel that she was conducting "due diligence" interviews of witnesses regarding the remaining charges, and would eventually make a recommendation regarding those charges as well.

- Smith expressed significant concerns about the cases against Appellee and his wife, made clear that she (Smith) had no role in obtaining the indictments, further stated that the interviews of witnesses she was conducting should have been conducted much earlier, and also stated that she would refuse to try the case if her office decided to go forward on any of the charges. Smith conveyed several reasons why the charges against Appellee were without merit. Smith requested that certain information be put in a written submission for her to use in connection with her recommendations.

- Smith "apologized" on behalf of the District Attorney's Office.

- On October 19, 2012, Appellee's counsel emailed the written submission to Smith.

- Shortly after the meeting with Smith, the District Attorney's Office filed a motion to dismiss all charges against Appellee's wife.

- On October 22, 2012, in response to the email from Appellee's counsel, Smith stated that even though she was in the middle of a "reevaluation" of the cases against Appellee and his wife, which had already caused Smith to recommend and obtain dismissals against Appellee's wife, Smith had been removed from the Hill case effective the previous Friday and was reassigned to a different department.

After considering Appellee's *Motion to Dismiss* and the proffered evidence, which included sworn deposition testimony from Blue and Malouf, telephone records and emails produced by Blue, Watkins's campaign finance records, and other materials, the trial court set a hearing date of February 18, 2013 on the motion (the first hearing ultimately took place on February 14, 2013). (CR-180, 501-502; CR-182, 496; CR-183, 495; CR-191, 496).

**9. The lead-up to the hearing held on February 14, 2013**

On January 22, 2013, Appellee served subpoenas on Watkins and other members of the District Attorney's Office, seeking to compel testimony and the production of documents in connection with the evidentiary hearing. (CR-180, 540-546, 567-573). The subpoenas requested additional evidence of communications between Watkins and Blue relating to Appellee and his wife. (CR-180, 545-46, 571-573).

In response to the subpoenas, the State filed a series of motions to quash and moved for a protective order, arguing that the State had a privilege under the work product doctrine not to provide any of the information sought by Appellee's subpoenas. (CR-180, 523-573).

On February 12, 2013, Blue voluntarily filed an affidavit in which she testified about certain communications with Watkins concerning the indictments. (CR-180, 853-856).

31

**10. Hearing on February 14, 2013 – trial court rules that Appellee made a *prima facie* showing on each of his claims and was entitled to an evidentiary hearing concerning whether Watkins was influenced by Blue with respect to the decision to approve the indictments of Appellee and his wife**

On February 14, 2013, the trial court ruled that in the *Motion to Dismiss* and the evidence proffered with the motion, Appellee made a *prima facie* showing on each of his claims and was entitled to an evidentiary hearing concerning whether Watkins was influenced by Blue with respect to the decision to approve the indictments of Appellee and his wife. (RR2, 27-28). The trial court found that Appellee was entitled to examine both Blue and Watkins about their discussions with each other concerning the indictments. (RR2, 28-29, 41).

Then, counsel for Blue informed the trial court that Blue was being criminally investigated on the issues raised in the *Motion to Dismiss*. (RR2, 6). Appellee was directed by the trial court to call Blue to the witness stand. (RR2, 29-30). Although Blue submitted the affidavit just two days earlier that addressed the topics on which she was to be examined (CR-180, 853-856), Blue refused to testify after invoking the Fifth Amendment. (CR-180, 852-856; RR2, 46-48). In response to the single substantive question of: "[D]id you discuss potential indictments against Albert and [Erin] Hill with [Watkins] in March of 2011?", Blue invoked her privilege. (RR2, 48). Blue also refused to answer any other questions. (RR2, 48).

Appellee called Watkins to the stand. (RR2, 49). Through an assistant district attorney, the State announced that Watkins would not testify about his conversations with Blue because such conversations were supposedly "work product." (RR2, 51-54, 56-58). On behalf of Watkins, the State also claimed law enforcement and executive privileges. (CR-180, 554-558; RR2, 66). The trial court overruled these objections.

Then the State claimed that although Watkins was in *the building* and in his office, he was too ill to testify. (RR2, 66-67). In reliance on this representation, the trial court granted the State a continuance, and rescheduled the hearing for March 7, 2013. (RR2, 71-72).

**11. Between March 1 and 6, 2013, the State files for mandamus in the Court of Appeals and this Court, all of which are denied**

On March 1, 2013, the State filed a *Petition For Writ of Mandamus And Motion For Temporary Relief*, asking the Court of Appeals to enjoin the trial court's scheduled hearing on the following grounds: (1) Watkins's testimony was privileged; and (2) Appellee was not entitled to an evidentiary hearing. (CR-180, 1163-1202; CR-182, 1042-1081; CR-183, 1041-1080; CR-191, 789-839).

On March 6, 2013, the day before the hearing was to take place, the Fifth District Court of Appeals denied the State's petition. (CR-191, 841).

On the same day, the State filed a Petition for Writ of Prohibition and Petition for Writ of Mandamus and Motion for Temporary Stay in Proceedings to this Court.

33

(CR-180, 1215-1259; CR-191, 843-874, 876). This Court denied the State's petition.

On the morning of the hearing, March 7, 2013, the State made a third attempt to stop the hearing, which also was rejected by this Court. (CR-191, 878-883, 885; RR4, 25-26).

### 12. Hearing on March 7, 2013 – trial court draws an adverse inference and dismisses the indictments against Appellee

At the beginning of the hearing on March 7, 2013, Blue's counsel represented to the trial court that based upon Blue's Fifth Amendment rights, Blue would once again refuse to testify in response to substantive questions. Blue was excused. (RR4, 7-8).

Appellee then called Watkins to testify. Watkins first was asked the following question: "Mr. Watkins, before the indictments of Appellee and his wife were handed down, you had at least one or more phone calls with Lisa Blue concerning (Appellee and his wife), correct?" Watkins answered: "Based on the advice of my counsel and of the advice of my staff with the District Attorney's Office, I am refusing to answer any questions that you may pose be—because of my right as an attorney to have the privilege and to protect my work product." (RR4, 15).

Then Watkins was asked: "You said to Blue, words to the effect of, 'There could be an indictment of Appellee, or both the Hills. Are you still interested in the

indictments?' Correct, sir?" (RR4, 15). In response to this question, Watkins again claimed attorney and work-product privileges. (RR4, 15).

The trial court overruled Watkins's objections and directed him to answer these questions. (RR4, 15). Watkins refused. (RR4, 15)

Appellee called to the witness stand Strittmatter and Martin, both of whom were then employed by the District Attorney's Office, and also Moore, who at the time of the hearing was the former First Assistant. Strittmatter, Martin, and Moore had already submitted sworn statements discussing the State's investigation of Appellee and his wife, and the decision to present the cases to the grand jury for indictment. (CR-180, 773-778; CR-182, 682-686; CR-183, 681-685; CR-191, 782-785; RR4, 12-13, 40).

It was revealed that the State's "investigation" of Appellee and his wife relied extensively on materials submitted by Hill Jr., who the State knew to have recently committed perjury. (RR4, 103, 141-142). The State never issued grand jury subpoenas to Hill Jr. or to his trust. (RR4, 103, 141-142). In fact, before seeking indictments against Appellee and his wife, although Martin had spoken to Hill Jr., his attorney, and someone in the general counsel's office at OmniAmerican, the State never conducted interviews with the loan officer at OmniAmerican, the mortgage broker who presented the application to OmniAmerican, the title company who

conducted the title search on the property at issue, Appellee, his wife, or counsel for Appellee and his wife. (RR4, 94:5–96:4, 141:3–17, 156:16–57:6).

On October 12, 2012, counsel for Appellee met with assistant district attorney Deborah Smith, to whom the case had then-been reassigned. (RR4, 216-218; CR-180-Supp-Aug02, 92). During this meeting, Smith apologized for how the State handled the cases against Appellee and his wife, indicated that she was conducting "due diligence" interviews of witnesses, and stated that she would recommend dismissing certain or all of the charges against both Appellee and his wife. *Id*. Later that same day, the District Attorney's Office moved to dismiss all charges against Erin Hill (Appellee's wife) "in the interest of justice." *Id*.

Smith was soon removed from the case and reassigned to the animal cruelty unit. *Id*. The indictments against Appellee were reassigned to Strittmatter. (CR-180, 487; CR-182, 483; CR-183, 483; CR-191, 482).

The State also admitted that the charges against Appellee are "unprecedented." (RR4, 49-50, 126-129, 155). This stems from the fact that underlying these indictments, the loan was funded, was paid as expected, was repaid in full, and there was no complaint from OmniAmerican. *Id*. And, Appellee's undisputed 20 percent ownership interest in the property was sufficient to fully secure the entire of loan, so not only was there no loss, there was never any risk of loss. (RR4, 88-89).

Further, despite the fact that Martin's handwritten notes reflect that she told Pickett that OmniAmerican "...really isn't interested in prosecuting," and that she "didn't see how [she] could prove his criminal case," especially since the "victim" (OmniAmerican) suffered no harm and did not want to prosecute, (RR4, 183-185, 201; RR5, DX-8; 1084), Martin testified that she had always believed that the case against Appellee was "strong" and certain to be indicted from the moment it was first reported to the office by Hill Jr.'s attorney. (RR4, 149-150, 171). By adding undated additional language that contradicted what she had written over two years earlier, Martin also admitted during the hearing that she augmented her September 2010 notes in a manner that was calculated to make them appear more favorable to the State. (RR4, 188-189).

Finally, although Moore testified that a defense attorney's request to address the grand jury is routinely accommodated by a prosecutor before seeking indictments, and in this case, Blue in substance made such a request on behalf of Appellee when she met with Moore in May 2010, neither Appellee nor his new counsel were ever informed that criminal charges were being contemplated. (RR4, 53-56).

During the hearing, the State did not object to Appellee calling Strittmatter, Martin, and Moore; in fact, the State previously invited Appellee to question Martin, offering that Martin could "respond[ ] to the inquiries regarding the progression of

the—of the—investigation" and could fully "respond to [Appellee's] allegations." (RR3, 15-16). The State invoked no work-product objections to any questions during the course of the testimony of Strittmatter, Martin, and Moore. Nor did the State attempt to limit the scope of the testimony of Strittmatter, Martin, and Moore during the hearing. Strittmatter, Martin, and Moore were allowed to testify extensively regarding the State's investigation of Appellee and his wife, the "pitch session," Watkins's involvement in the "pitch session," and internal deliberations regarding the State's decision to indict Appellee and his wife. The State elicited testimony concerning the events at issue and introduced into evidence internal work product, including a PowerPoint presentation that was used by Martin at the "pitch session." (RR5, SX-2, 68-76).

The State also stipulated to the authenticity and admissibility of nearly all of the evidence attached to Appellee's Motion, including the sworn deposition testimony, Blue's phone records and emails, and Watkins's campaign finance reports. (RR4, 29-31).

**13. The trial court's findings and dismissal of the indictments against Appellee**

The trial court did not put "much credibility" in Moore's testimony due to Moore's relationship with Blue and Watkins. (RR4, 191). And, the trial court did not find Martin's testimony credible. It further found that the testimony of the Moore and Martin was not sufficient to answer the question of whether Watkins's decision

38

to approve the indictments of Appellee and his wife was improperly influenced by his relationship with Blue. (RR4, 188-191, 216).

Before the conclusion of the March 7, 2013 hearing, the trial court gave Watkins another opportunity to testify, and he again refused to do so. (RR4, 191-195).

The trial court concluded that an adverse inference was appropriate as to Blue based on her invocation of the Fifth Amendment and refusal to answer questions about her conversations with Watkins. (RR4, 196).

The trial court dismissed the indictments against Appellee, concluding that he had been denied the right to a meaningful hearing regarding the alleged constitutional violation due to Watkins's refusal to testify, Blue's invocation of her Fifth Amendment privilege, and that the State had failed to rebut Appellee's *prima facie* showing of prosecutorial misconduct. (RR4, 219).

The trial court issued an order dated March 7, 2013 dismissing the cases against Appellee. (CR-180, 1100; CR-182, 978; CR-183, 977; CR-191, 894). On August 2, 2013, the trial court issued detailed findings of fact and conclusions of law. (CR-180-Supp-Aug02, 78-116).

## IX. Summary of the Arguments

Appellee will argue that to establish a *prima facie* case of selective prosecution in violation of the Fifth and Fourteenth Amendments, and to obtain a hearing under the "presumption of prosecutorial vindictiveness" method, a defendant must provide "some evidence" that shows: (1) the government singled out the defendant for prosecution and has not proceeded against others similarly situated based on the type of conduct for which the defendant is charged; and (2) the government's discriminatory selection is invidious. Once the defendant makes this showing, the burden shifts to the State to justify the discriminatory treatment.

Appellee will ask this Court to clarify what constitutes "some evidence" and hold that so long as a defendant attaches a proffer of evidence to a motion to dismiss due to prosecutorial misconduct, the trial court in its discretion determines to present a colorable claim of a constitutional violation, the defendant has attached "some evidence," and the trial court should have the discretion to conduct a hearing on the motion to dismiss.

Appellee will also ask this Court to find that Appellee not only attached "some evidence" showing a constitutional violation, but in fact attached "exceptionally clear evidence."

Finally, Appellee will ask this Court to find that the Court of Appeals erred when it: (1) sustained the State's second issue and concluded that Appellee "did not

40

make the proper showing sufficient to establish a *prima facie* case..." of the fact that the former elected district attorney of Dallas County engaged in prosecutorial misconduct by allowing himself to be corruptly influenced by a political ally in return for indicting Appellee; (2) found that the trial court erred in conducting a hearing on Appellee's motion to dismiss based upon prosecutorial misconduct; (3) vacated the trial court's Order Granting Motion to Dismiss; and (4) remanded the case to the trial court to reinstate the indictments against Appellee.

As a result, Appellee will ask this Court to reverse the judgment and opinion of the Court of Appeals, find that Appellee provided "some evidence" constituting a colorable claim that allowed the trial court to exercise its discretion to order a hearing, and affirm the trial court's *Order Granting Motion to Dismiss*.

## X. Argument

1. <u>Issue One</u>: **To establish a *prima facie* case of selective prosecution in violation of the Fifth and Fourteenth Amendments, and to obtain a hearing under the "presumption of prosecutorial vindictiveness" method, a defendant must provide "some evidence" that shows: (1) the government singled out the defendant for prosecution and has not proceeded against others similarly situated based on the type of conduct for which the defendant is charged; and (2) the government's discriminatory selection is invidious. Once the defendant makes this showing, the burden shifts to the State to justify the discriminatory treatment.**

   **Appellee asks this Court to clarify what constitutes "some evidence" and hold that so long as a defendant attaches a proffer of evidence to a motion to dismiss due to prosecutorial misconduct, the trial court in its discretion determines to present a colorable claim of a constitutional violation, the defendant has attached "some evidence," and the trial court should have the discretion to conduct a hearing on the motion to dismiss. Appellee also asks this Court to find that Appellee not only attached "some evidence" showing a constitutional violation, but in fact attached "exceptionally clear evidence."**

   **Finally, Appellee asks this Court to find that the Court of Appeals erred when it: (1) sustained the State's second issue and concluded that Appellee "did not make the proper showing sufficient to establish a *prima facie* case..." of the fact that the former elected district attorney of Dallas County engaged in prosecutorial misconduct by allowing himself to be corruptly influenced by a political ally in return for indicting Appellee; (2) found that the trial court erred in conducting a hearing on Appellee's motion to dismiss based upon prosecutorial misconduct; (3) vacated the trial court's *Order Granting Motion to Dismiss*; and (4) remanded the case to the trial court to reinstate the indictments against Appellee.**

   i. **Introduction – so long as the prosecution is not for an improper purpose, prosecutors have the discretion to prosecute**

   In the American criminal justice system, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a

42

grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see* U.S. Const. Art. II, § 3; 28 U.S.C. § 547 (2015) ("Except as otherwise provided by law," U.S. Attorneys... "shall prosecute for all offenses against the United States."); Tex. Code Crim. Proc. Art. 2.01 (2015) (district attorneys "shall represent the State in all criminal cases in the district courts...[I]t shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused.").

Further, there is a rebuttal presumption that a criminal prosecution is brought in good faith. *Gawlik v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980); *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926) (The "presumption of regularity" supports prosecutorial decisions, and "in the absence of clear evidence to the contrary, courts presume that (prosecutors) have properly discharged their official duties.").

But, if a prosecution is brought for an improper purpose, such as a *quid pro quo* to a political ally who "improperly influences" the prosecutor in *any* manner – including but not limited to bribing the prosecutor through "campaign contributions" when there is no "campaign" – due process and equal protection of the law are violated, and a court has the right, and the duty, to protect defendants from prosecutorial decisions that are based on unconstitutional motives or executed in bad

faith. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (A selective-prosecution claim asks a trial court to exercise judicial power over a "special province" of the executive branch).

And, prosecutors are public officials who must serve the public's interest – not their own. *Berger v. United States*, 295 U.S. 78, 88 (1935).  As the Supreme Court observed in *Berger*, a prosecutor is:

> "...the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done... [H]e may prosecute with earnestness and vigor...[B]ut, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

The Supreme Court has also made it clear that a prosecutor cannot hide behind the cloak of "prosecutorial discretion" as Watkins attempted to do and avoid judicial scrutiny if the prosecutor's decision to prosecute was motivated by improper reasons. *See Dunlop v. Bachowski*, 421 U.S. 560, 567 n.7, 568-574 (1975) (On issue of judicial review of an enforcement decision of an administrative agency of the executive branch, the Court rejected the agency's contention that its decisions are unreviewable exercises of prosecutorial discretion) and *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (Holding that "some selectivity" in enforcing criminal laws does

44

not violate the equal protection clause, but a defendant may show that the decision to prosecute was based upon an improper purpose).

The concept of the prohibition against selective and vindictive prosecution dates back nearly 130 years, when in *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374 (1886), the Supreme Court of the United States held that the selective prosecution of Chinese laundry owners violated equal protection because similarly situated non-Chinese laundry owners were not arrested or prosecuted. In *Yick Wo*, although the Chinese laundry owners complied with regulations pertaining to laundries, San Francisco passed an ordinance that prohibited the operation of a laundry in a wooden building without a permit. *Id*. at 358-361. At the time, nearly all of the existing 320 laundries operated in wooden buildings. *Id*. Out of about 200 applications filed by Chinese owners for the permit, only one was granted, while the city granted 79 out of the 80 applications filed by non-Chinese owners. *Id*. Although 240 of the laundries were Chinese-owned and 80 were owned by non-Chinese, the prosecutor charged over 150 Chinese laundry owners for violating the regulations, but did not charge or prosecute a single non-Chinese laundry owner because all but one were granted permits. *Id*. at 360-364.

*Yick Wo* specifically addressed issues of racial discrimination in selective prosecution cases. *Yick Wo* was handed down before the dubious opinion in *Plessy v. Ferguson*, 163 U.S. 537 (1896), which upheld the constitutionality of state laws

requiring racial segregation in public facilities under the "separate-but-equal" doctrine. Plessy was not repudiated by the Court until its decision in *Brown v. Board of Education*, 347 U.S. 483 (1954). But the fundamental holding in *Yick Wo* is clear: regardless of whether a law appears to be valid on its face, if it is prosecuted in an improper manner, a violation of the Equal Protection Clause of the Fourteenth Amendment occurs. As Justice Matthews wrote,

> "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

*Id*. at 373-374. In the case before this Court, the circumstances in *Yick Wo* are in principle replayed: Texas Penal Code § 32.32, False Statement to Obtain Credit, certainly appears to be "fair on its face and impartial in appearance." When it was "applied and administered" (used to prosecute Appellee), however, by a "public authority" (Watkins) who does so "with an evil eye and an unequal hand" (because he was improperly influenced by Blue), "so as practically to make unjust and illegal discriminations between persons in similar circumstances," [the State admitted that the home-equity loan was never in arrears, had been fully repaid before the commencement of any criminal investigation, and thus the indictments against Appellee are "unprecedented" (RR4, 49, 126, 129, 155)]..., "the denial of equal

46

justice is still within the prohibition of the Constitution" (Appellee was selectively prosecuted by Watkins for an improper and illegal purpose).

Stated under present-day laws and standards, under the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments, to establish a *prima facie* case of selective prosecution and to obtain a hearing under the "presumption of prosecutorial vindictiveness" method, a defendant must provide "some evidence" that shows: (1) the government singled out the defendant for prosecution and has not proceeded against others similarly situated based on the type of conduct for which the defendant is charged; and (2) the government's discriminatory selection is invidious. Once the defendant makes this showing, the burden shifts to the State to justify the discriminatory treatment.

Appellant will show that "some evidence" means evidence that constitutes a **colorable claim** of a constitutional violation that may prove the elements of a presumed selective prosecution claim, and **not** evidence that proves the constitutional violation: (1) beyond a reasonable doubt, (2) by clear and convincing evidence, or (3) by a preponderance of the evidence.

As a result, Appellee asks this Court to clarify what constitutes "some evidence." Appellee also asks this Court to find that so long as a defendant attaches a proffer of evidence to a motion to dismiss due to prosecutorial misconduct that the trial court in its discretion determines to present a colorable claim of a constitutional

47

violation, the defendant has attached "some evidence," and a trial court has the discretion to conduct a hearing on the motion to dismiss.

Appellee met the burden set forth by the Supreme Court because he proffered with the *Motion to Dismiss* not just "some evidence," but rather "exceptionally clear evidence" proving that Watkins: (1) singled Appellee out for prosecution and did not proceed against others similarly situated based on the type of conduct for which Appellee was charged; and (2) acted in an invidious manner. *Green v. State*, 934 S.W.2d 92, 103 (Tex. Crim. App. 1996); *Matney v. State*, 99 S.W.3d 626, 628 (Tex. App. Houston [1st Dist.] 2002); *Gawlik v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980); U.S. Const. Amend. V; U.S. Const. Amend. XIV. Therefore, Appellee was entitled to an evidentiary hearing.

Yet, in a 2-1 decision, the Court of Appeals ruled that Appellee should have *never* received a hearing in the first place. If the evidence Appellee attached to his *Motion to Dismiss* as a proffer does not constitute "some evidence" that establishes a *prima facie* case of selective prosecution, then absent an *admission* by a prosecutor that he or she: (1) singled a defendant out for prosecution and did not proceed against others similarly situated based on the type of conduct for which the defendant was charged; and (2) acted in an invidious manner, there is no circumstance that could allow a defendant to obtain a hearing on a selective prosecution claim based upon a

48

claim of "presumption of prosecutorial vindictiveness" that the State must rebut or face dismissal of the charges (such as was alleged in Appellee's case).

> **ii. To raise a "presumption of prosecutorial vindictiveness," a defendant must present evidence of circumstances that pose a "realistic likelihood" of misconduct. When the defendant does so, the defendant makes a *prima facie* case. The burden then shifts to the State to rebut this presumption or face dismissal of the charges**

A constitutional claim of prosecutorial vindictiveness or selective prosecution may be established in two ways: (1) by presenting evidence of circumstances that pose a "realistic likelihood" of misconduct that is sufficient to raise a "presumption of prosecutorial vindictiveness," which the State must rebut or face dismissal of the charges (as alleged in Appellee's case); or (2) by presenting proof of "actual vindictiveness," which means providing direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right. *See Neal v. State*, 150 S.W.3d 169, 173 (Tex. Code Crim. App. 2004) (explanation of both methods of establishing prosecutorial vindictiveness or selective prosecution) and *United States v. Goodwin*, 457 U.S. 368, 380-381 (1982) (explanation of actual vindictiveness).

Next, a selective-prosecution claim "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). In *Armstrong*, the Supreme Court noted that its precedent

49

shows that the standard to prove a claim of selective prosecution is a "demanding" standard, and that there is a "background presumption" that what a defendant must show in the first instance to obtain discovery (through a hearing) "should itself be a significant barrier to the litigation of insubstantial claims." *Id*., *citing United States v. Mezzanatto*, 513 U.S. 196, 203 (1995) (explanation of "background presumption" as it relates to the voluntary waiver of legal rights). But it should not prevent a defendant's legitimate claims when they are supported by "some evidence."

In the *Motion to Dismiss* and the proffer of evidence attached to the motion, Appellee clearly showed that Watkins: (1) singled Appellee out for prosecution and has not proceeded against others similarly situated based on allegations of mortgage fraud; and (2) clearly acted in an invidious manner, as he pursued the indictments against Appellee because Watkins allowed himself to be corruptly influenced by Blue. Therefore, Appellee made a *prima facie* case of violations of the Fifth and Fourteenth Amendments under the "presumption of prosecutorial vindictiveness" method. Appellee was therefore entitled to a hearing because he made a colorable claim of a constitutional violation.

**iii. The majority opinion's characterization of the evidence attached to the *Motion to Dismiss* is inaccurate. Nearly all of the evidence proffered by Appellee and attached to the *Motion to Dismiss*: (1) would be admissible in a hearing without further authentication; and (2) constitutes "exceptionally clear" evidence that the decision to prosecute was for an improper purpose, exceeding the standard that the trial court must, in its discretion, find "some evidence" of a colorable claim of a constitutional violation**

In the dissenting opinion, Justice Bridges does an excellent job of presenting the facts and describing the proceedings that took place in the trial court. *See Hill, id.* at 40-51 (Bridges, J. dissenting). Justice Bridges writes that, to establish a *prima facie* case of selective prosecution, a defendant must provide "exceptionally clear" evidence that the decision to prosecute was for an improper reason. *Id.* at 53, *citing Garcia v. State*, 172 S.W.3d 270, 274 (Tex. App. El Paso, 2005) [A defendant claiming selective prosecution must come forth with "exceptionally clear evidence" that the prosecution was initiated for an improper reason, citing *Nelloms v. State*, 63 S.W.3d 887, 893 (Tex. App. Fort Worth 2001, *pet. ref.*)].

But Appellee argues that, although the standard that Justice Bridges believes should apply before a defendant is entitled to a hearing ("exceptionally clear" evidence) accurately describes the evidence proffered in the *Motion to Dismiss*, Appellee believes that the standard that this Court should adopt, which is "some evidence" that the trial court in its discretion determines to be a colorable claim of a constitutional violation.

51

First, the majority opinion below characterizes the evidence attached to the *Motion to Dismiss* as "...forty-four exhibits...most of which were unauthenticated or not otherwise identified by affidavit testimony." *Hill, id*. at \*8-9. As explained by the majority, the exhibits include: (1) Hill Jr.'s February 2010 complaint to the Dallas District Attorney's office, (2) pleadings from other proceedings, excerpts from Watkins's campaign finance reports, (3) email exchanges among attorneys counsel in the litigation between Blue and Appellee, (4) Blue's telephone records, (5) a log of text messages between Blue, Watkins, and his assistant, (6) announcements about the SMU scholarship funded by Blue and about Watkins's hiring of Blue to help in unrelated litigation, (7) a printout of a 2007 Texas Lawyer article about the district attorney's office's grand jury policy, (8) Smith's email about her reassignment, (9) excerpts from transcripts in the litigation between Blue and Appellee, (10) deposition testimony from Blue in the litigation between Blue and Appellee in which Blue testified to receiving two phone calls from Watkins about the indictments of the Appellee and his wife, and (11) deposition testimony from Blue's co-counsel in the litigation between Blue and Appellee, Malouf, who testified to overhearing one of those conversations. *Hill, id*. at \*8-9; *see* CR-180, 68-488.

The majority characterizes this evidence as insufficient and **not** "exceptionally clear evidence" or even "some evidence" that shows: (1) Watkins

52

singled out Appellee for prosecution and has not proceeded against others similarly situated based on the type of conduct for which Appellee is charged; and (2) Watkins's discriminatory selection is invidious. As a result, the majority believes that Appellee did not make a *prima facie* case of prosecutorial misconduct, so Appellee was not even entitled to a hearing at the discretion of the trial court.

The majority's characterization of the evidence proffered with the *Motion to Dismiss* is inaccurate because nearly all of the evidence proffered is admissible without further authentication as follows:

- Sworn testimony or former testimony under Tex. Rule Evid. 804(b)(1) (2013) (Transcripts or deposition testimony in the Blue-versus-Appellee litigation, which included phone records that were authenticated during the depositions, *see* CR-180, 193-408);

- Public records exception to the hearsay rule under Tex. Rule Evid. 803(8) (2013) (excerpts from Watkins's campaign finance reports; and the February 2010 complaint sent to the Dallas District Attorney's office by Hill Jr.'s attorney, as a governmental record is "anything belonging to, received by, or kept by government for information," *see* Tex. Pen. Code § 37.01(2)(A) (2015) and *Fox v. State*, 418 S.W.3d 365, 371 (Tex. App. Texarkana 2012) (a document received by the government is a "government record"); *see also* Tex. Loc. Gov. Code § 201.003(8) (2013) (A "local government record" is any document regardless of physical form or characteristic and regardless of whether public access to it is open or restricted under the laws of the state, **created or received** by a local government or any of its officers or employees in the transaction of public business);

- Admissions by the State under Tex. Rule Evid. 801(3) (2013) or statements against interest under Tex. Rule Evid. 804(b)(3) (2013) (Announcements about the SMU scholarship funded by Blue and about Watkins's hiring of Blue to help in unrelated litigation, printout of a 2007 Texas Lawyer article about the office's grand jury policy, Smith's email about her reassignment,

53

and log of text messages between Blue and Watkins and his assistant, email exchanges among attorneys in the litigation between Blue and Appellee);

Therefore, most of the evidence proffered by Appellee and attached to the *Motion to Dismiss* would have been admissible during a hearing without further authentication. The evidence was more than sufficient to make a *prima facie* case of prosecutorial misconduct, and the trial court was well within its discretion to order a hearing.

But even if the evidence proffered with the *Motion to Dismiss* was not admissible without further authentication, Appellee argues that in order for a trial court to have the discretion to order a hearing, defendant is not required to authenticate proffered evidence as though the defendant is filing a motion for summary judgment under Texas Rule of Civil Procedure 166a, especially when the proffered evidence is affidavits, declarations, self-authenticating documents, deposition transcripts, and public or governmental documents.

Rather, this Court should adopt a standard that a "proffer of evidence" means "some evidence" that establishes a "colorable claim" of selective prosecution that a defendant tenders to the trial court in good faith, and then leave it up to the trial court to exercise its discretion in allowing a hearing on a motion to dismiss for prosecutorial misconduct. Proffered evidence generally is evidence that is offered to a court so that the court can make a ruling on its admissibility. Black's Law Dictionary, 579 (7th ed. 1999). In Texas, when a party proffers evidence, a trial court's ruling on the admissibility of evidence is reviewed under an abuse of

discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the ruling is within the zone of reasonable disagreement, an appellate court will not disturb it. *Id*. When a trial court decides to admit the evidence, finding that the probative value of the evidence is not outweighed by the danger of unfair prejudice, this decision is given deference. *Id*. Thus, a reviewing court does not simply substitute its own decision for that of the trial court. *Id*.

A "proffer of evidence" in the context of a selective prosecution claim that allows a trial court in its discretion to order a hearing on the claim should be no different than the procedure to obtain a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), where a defendant contests the truthfulness of an affidavit supporting a search warrant. There are two significant similarities between claims of selective prosecution and those made under *Franks*. First, just like there is a "presumption of regularity" that courts presume prosecutors have "properly discharged their official duties," which means that it is presumed that prosecutors do not pursue indictments in exchange for allowing themselves to be corruptly influenced (as Watkins did), *see Armstrong*, 517 U.S. at 464, there is also a presumption of truthfulness or validity to an affidavit supporting a search warrant. *Franks*, 438 U.S. at 171; *see also Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2002) (An affidavit supporting a search warrant begins with a presumption of validity, so a defendant has the burden of

55

making a preliminary showing of deliberate falsehoods in that affidavit before he is entitled to a *Franks* hearing).

Second, when a defendant seeks a *Franks* hearing, the defendant must proffer to the trial court an allegation: (1) of deliberate falsehood or reckless disregard for the truth, accompanied by an offer of proof [*Hinojosa v. State*, 4 S.W.3d 240, 247 (Tex. Crim. App. 1999)]; (2) that points specifically to portions of the affidavit claimed to be false, accompanied by a statement of supporting reasons [*Cates*, 120 S.W.3d at 357] (The defendant made a sufficient preliminary showing to be entitled to an evidentiary hearing by specifying six specific portions of warrant affidavit that defendant claimed he knew to be false); and (3) that shows that the false matter was necessary to support a finding of probable cause. *See Harris v. State*, 227 S.W.3d 83, 85 (Tex. Crim. App. 2007). If these three conditions are met, and the contents of the affidavit that are not challenged are insufficient to support a finding of probable cause, the defendant is entitled to a hearing on the issue of the truthfulness of the affidavit. *Harris*, 227 S.W.3d at 85.

In order to obtain a *Franks* hearing, a defendant need not include a sworn affidavit to make the preliminary showing. *Ramsey v. State*, 579 S.W.2d 920, 923 (Tex. Crim. App. 1979); *Cates*, 120 S.W.3d at 359 (same). In *Ramsey*, this Court noted that in *Franks*, no affidavit or other written material was offered, but only a statement by the defense attorney ***as to what would be shown if he were allowed to***

*call witnesses on the issue*. *Ramsey*, 579 S.W.2d at 923 (emphasis added). Such a preliminary showing was sufficient to justify a hearing. *Id*.

Thus, if merely alleging a deliberate falsehood or reckless disregard for the truth, accompanied by an offer of proof, enables a defendant to a *Franks* hearing in order to prove a constitutional violation, a trial court should be within its discretion to order a hearing on a claim of prosecutorial misconduct to determine whether the defendant was selectively prosecuted if the defendant attaches "some evidence" as a proffer to the motion to dismiss that the trial court in its discretion determines to present a colorable claim of a constitutional violation. There should be no requirement that affidavits or sworn statements be attached to a motion to dismiss (as the majority of the Court of Appeals implies).

Thus, in their ruling, the majority justices carved out an unprecedented rule in which, absent an *admission* by a prosecutor that he or she: (1) singled a defendant out for prosecution and did not proceed against others similarly situated based on the type of conduct for which the defendant was charged; and (2) acted in an invidious manner, there is **no circumstance** that would allow a trial court the discretion to grant a hearing on a motion alleging a selective prosecution claim under the "presumption of prosecutorial vindictiveness" method. The majority's opinion thus eliminates a defendant's ability to present evidence of circumstances that pose a "realistic likelihood" of misconduct that is sufficient to raise a "presumption of

prosecutorial vindictiveness," which the State must rebut or face dismissal of the charges (as alleged in Appellee's case), and leaves a defendant who may be victimized as Appellee was by Watkins only the ability to prove "actual vindictiveness," which means providing direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right. *See Neal*, 150 S.W.3d at 173 and *Goodwin*, 457 U.S. at 380-381. This should not stand not only for public policy reasons, but as Appellee will explain below, such a standard is nearly impossible to meet because evidence of prosecutorial misconduct is often solely in the prosecutor's possession.

> **iv. "Some evidence" means that a defendant must attach to the motion to dismiss evidence that establishes that the defendant has a colorable claim of a constitutional violation. This allows the trial court to exercise its discretion in ordering the hearing. Once a hearing is held, the defendant must show by "exceptionally clear evidence" that the prosecution was initiated for an improper reason.**

Even if this Court takes the position that the proffer of evidence with a motion to dismiss may be similar to a proffer under *Franks*, there still remains the issue of what constitutes "some evidence." The Supreme Court in *Armstrong* provides some guidance, but falls short of clearly defining "some evidence." To understand the basis of *Armstrong*, Appellee begins with a brief analysis of the proceedings in the court of appeals. The court of appeals held that a trial court is within its discretion to allow a hearing for discovery if a defendant presents evidence providing a

58

colorable basis of selective prosecution. *United States v. Armstrong*, 48 F.3d 1508, 1512 (9th Cir. 1995). Here, the defendant and several others were indicted for distribution of the cocaine-based drug known as "crack." *Id.* at 1510-1511. The defendants were all black. *Id.* They filed a motion to dismiss the indictments for selective prosecution, alleging that due to their race, the prosecutor filed federal charges rather than state charges. *Id.* In support, the defendants presented a study that shows that in all 24 cases handled by a local public defender's office that involved violations of the indicted offense, the defendants were black. *Id.* The government provided no explanation or rebuttal evidence. *Id.* at 1511. The trial court granted the defendants' motion for discovery. *Id.*

Rather than comply with the discovery order, the government filed a motion for reconsideration and presented a list of all defendants charged with the subject offense over a three-year period but without any racial breakdown, and declarations by three law enforcement officers and two Assistant United States Attorneys that provided four explanations for the study's implication that the overwhelming bulk of federal prosecutions for cocaine-base offenses targeted black defendants. *Id.* The declarations: (1) asserted that socio-economic factors led certain ethnic and racial groups to be particularly involved with the distribution of crack and that blacks were particularly involved in the crack trade; (2) asserted that during the three-year period, a total of eleven defendants who are not black but were members of racial or ethnic

59

minority groups were prosecuted for crack; (3) asserted that many blacks had been tried in state court for cocaine-base offenses; (4) contained a description of some of the general factors on which federal prosecutors based their charging decisions for crack-related offenses; and (5) asserted other unidentified "race-neutral" criteria. *Id.*

In response, the defendants submitted an article and two affidavits from defense attorneys that showed that: (1) an equal number of white people and minorities use and deal crack; (2) many nonblacks are prosecuted in state court for crack offenses; and (3) the federal penalty for crack offenses is higher than the penalty for powder cocaine offenses, and that most federal prosecutions for crack offenses involve black defendants. *Id.* at 1511-1512. The trial court denied the government's motion for reconsideration, and after the government failed to comply with the discovery order, the trial court granted the defendants' motion to dismiss the indictments. *Id.* at 1512.

The court of appeals held that the "colorable" basis standard is the proper one for deciding whether a trial court has the discretion to allow a hearing for the purposes of discovery on a motion to dismiss because: (1) if a defendant could establish a *prima facie* case, the defendant would not need discovery in the first place; (2) the "colorable" basis standard is consistent with the approach adopted by the majority of the other circuits courts (more on this below); (3) the "colorable" basis standard ensures that the government will not be called to answer for charging

60

decisions as a result of frivolous and unwarranted allegations; and (4) the "colorable" basis standard ensures that defendants will not face unjustified hurdles at the discovery stage that will preclude them from demonstrating the existence of actual discrimination in the selection of defendants for criminal prosecution. *Id*. at 1515. Thus, to be entitled to a hearing at the trial court's discretion, under the "colorable" basis standard, a defendant must present "some evidence" tending to show disparate treatment and discriminatory intent that entails a non-frivolous showing based on more than conclusory allegations. *Id*. at 1512. The government then has the opportunity to rebut the defendant's showing. Finally, the trial court evaluates the evidence and determines whether a colorable basis of selective prosecution still exists. *Id*. By applying these standards, the court of appeals in *Armstrong* held that the defendants made a colorable showing of selective prosecution. *Id*. at 1514-1515.

Thus, "some evidence" means evidence that demonstrates the defendant can make a colorable claim showing the existence of the discriminatory effect element, which would allow a trial court in its discretion to order a hearing. *Armstrong*, 517 U.S. at 469; *Garcia v. State*, 172 S.W.3d 270, 274 (Tex. App. El Paso 2005). Although on certiorari the Supreme Court did not clearly define what constitutes "some evidence," and criticized the ruling of the court of appeals that held that a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are similarly situated to the

61

defendant, the Court did not disturb the language "colorable basis for discriminatory effect."

It is clear that the Supreme Court's definition of "some evidence" means evidence that provides a colorable basis to show that the defendant can prove the two elements of a selective prosecution claim, which are: (1) the government singled out the defendant for prosecution and has not proceeded against others similarly situated based on the type of conduct for which the defendant is charged; and (2) the government's discriminatory selection is invidious and not for a proper purpose.

The "some evidence" requirement does **not** mean that for a trial court to be within its discretion to order a hearing, a defendant must prove the selective prosecution claim beyond a reasonable doubt, by clear and convincing evidence, or even by a preponderance of the evidence.

"Some evidence" means that a defendant must attach to the motion to dismiss evidence that establishes that the defendant has a colorable claim of a constitutional violation. This allows the trial court to exercise its discretion in ordering the hearing. Once a hearing is held, the defendant must show by "exceptionally clear evidence" that the prosecution was initiated for an improper reason. *See Garcia*, 172 S.W.3d at 274; *County v. State*, 812 S.W.2d 303, 308 (Tex. Crim. App. 1989) (same); *Gregg v. Georgia*, 428 U.S. 153, 199 (1976); and *McCleskey v. Kemp*, 481 U.S. 279, 297

(1987) (Exceptionally clear evidence required before a court may hold that prosecutorial discretion has been abused).

Because there is no definition of "colorable claim" or "exceptionally clear evidence" in the Texas Penal Code or Texas Code of Criminal Procedure, Appellee points this Court to the plain meanings of these phrases. *See Daniels v. State*, 754 S.W.2d 214, 219 (Tex. Crim. App. 1988) (Terms that are not defined by statute are given their plain meaning unless a statute clearly shows that they were used in some other sense.); *see also Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979) (same).

A "colorable claim" is one that is "plausible, credible, or conceivable." Concise Oxford American Thesaurus, 149 (2006). Or, it is a claim that is "legitimate and that may reasonably be asserted, given the facts presented and the current law." Black's Law Dictionary, 240 (7th ed. 1999). "Exceptionally clear evidence" is evidence that is "unusually obvious, plain, evident, and intelligible." Concise Oxford American Thesaurus, 138, 292 (2006).

Appellee made a "colorable claim" of a constitutional violation. The *Motion to Dismiss* and its attachments detail how Blue, who at the time was engaged in a fee dispute with Appellee, corruptly influenced Watkins, a close friend and fellow Democratic party operative, to authorize indictments against Appellee in exchange for a promise of and actual receipt of "campaign" contributions for a nonexistent

63

"campaign." The State admitted that the indictments were "unprecedented." (RR4, 49, 126, 129, 155; CR-180, 31-488). And, the indictments clearly benefitted Blue, as Appellee was forced to assert his Fifth Amendment privilege and did not testify on his own behalf during the fee dispute trial because of the pending criminal indictments.

And, Appellee not only proffered "some evidence" with the *Motion to Dismiss* that would establish a "colorable claim," enabling the trial court to exercise its discretion and order a hearing under the proposed standard. Appellee *in fact* proffered "exceptionally clear evidence." On its face, the proffered evidence makes it "obvious, plain, and evident" that Watkins pursued the indictments in exchange for allowing himself to be corruptly influenced by Blue. The evidence includes the following (*See* CR-180, 36-52):

- The case against Appellee was referred to the District Attorney's Office by the attorney for Hill Jr., who is an adverse party to Appellee in a federal lawsuit.

- On February 18, 2010, the judge in the federal lawsuit entered an order finding that Hill Jr.: (1) submitted summary judgment materials in bad faith and with the intent of committing fraud on the Court, and (2) lied under oath. The district court also found that Hill Jr.'s attorney had "far exceeded the bounds of advocacy, permissible or otherwise."

- Four days later, Hill Jr.'s father submitted a letter to the district attorney's office in which he accused Appellee and his wife of mortgage fraud.

- A few months later, the law firm partner of Hill Jr.'s attorney donated nearly $50,000 to the reelection campaign of Watkins even though no member of that firm had previously contributed to Watkins's campaigns. The

contributions immediately made the partner one of Watkins's largest individual contributors.

- The mortgage fraud allegations were dubious at best. The home equity loan obtained by Appellee was never in default, was repaid in full just a few months after it was obtained (long before Watkins considered criminal charges against Appellee), and was fully secured at all times by Appellee's undisputed equity in the subject home.

- OmniAmerican did not suffer any loss, was never at risk of suffering any loss, and never complained to authorities that Appellee did anything wrong or committed any crime.

- Prior to indicting Appellee, the District Attorney's Office did not interview key witnesses such as the loan officer or the mortgage broker.

- Despite the policy of the District Attorney's Office that defense attorneys would be provided notice of grand jury proceedings and have an opportunity to present their case to the grand jury, no such notice was given to Appellee or his attorneys. This is in the face of the fact that Moore, who was a witness during the motion to dismiss hearing, told Texas Lawyer that it was "all about fairness... This is not a railroad we are running...this is a justice system."

- Beginning in November 2009, Appellee was represented for about six months in the federal litigation by a group of attorneys that included Blue. Blue bragged to Appellee about her relationship with Watkins, and specifically told Appellee about her personal friendship with Watkins, generous campaign contributions she gave to Watkins, and pro bono representation of Watkins as his personal lawyer.

- While representing Appellee, Blue even discussed ways she might use her influence with Watkins to intimidate opposing counsel in the federal litigation.

- Shortly after the federal litigation settled in May 2010, Blue and the two attorneys with whom she represented Appellee demanded $50 million in attorney's fees for six months' work. When Appellee refused, Blue and the other attorneys withdrew from representing him and filed suit against Appellee.

- Two weeks before this fee dispute trial was set to begin in federal court on April 18, 2011, Appellee learned that he had been indicted. As a result of the indictments, Appellee was advised to not take the stand during the fee dispute trial.

- The federal court entered a judgment against Appellee and his wife for more than $34 million, which was later reduced to $21.9 million, with Blue personally standing to receive one-third of the judgment, or about $7.3 million.

- Appellee then obtained discovery from Blue regarding her communications with the District Attorney's Office. During a deposition, Blue admitted that Watkins had called her before the indictments were returned to discuss potential charges against Appellee. Blue stated that Watkins told her that "there could be an indictment or are you still interested in the indictments," or words to that effect.

- Through that discovery, a dramatic spike in communications between Blue and Watkins was revealed, which occurred in the weeks and days before the indictments were obtained. These communications included calls between Blue and both Watkins's office and cellphone numbers.

- Campaign finance records reflect that, on March 9, 2011, which was about three weeks before the indictments were presented, the Watkins campaign accepted a $5,000 donation from Blue. This was despite the fact that Watkins's "reelection campaign" had ended months earlier (Watkins had been reelected in November 2010).

- Blue solicited others who donated thousands more to Watkins around the same time.

- On March 30, 2011, the day before indictments against Appellee were presented to the grand jury, Blue and Watkins communicated seven times via Watkins's cellphone number.

- About 18 months after Appellee was indicted, on October 12, 2012, Appellee's counsel met with assistant district attorney Deborah Smith, who took over the cases against Appellee long after the indictment. Smith

described a "reevaluation" of the cases, and said that she had already determined that she would recommend dismissing certain charges against both Appellee and his wife (who had also been indicted). Smith also told Appellee's counsel that she was conducting "due diligence" interviews of witnesses regarding the remaining charges, and would eventually make a recommendation regarding those charges as well.

- Smith expressed significant concerns about the cases against Appellee and his wife, made clear that she (Smith) had no role in obtaining the indictments, further stated that the interviews of witnesses she was conducting should have been conducted much earlier. Smith also stated that she would refuse to try the case if her office decided to go forward on any of the charges. Smith conveyed several reasons why the charges against Appellee were without merit. Smith requested that certain information be put in a written submission for her to use in connection with her recommendations.

- Smith "apologized" on behalf of the District Attorney's Office.

- On October 19, 2012, Appellee's counsel emailed the written submission to Smith.

- Shortly after the meeting with Smith, the District Attorney's Office filed a motion to dismiss all charges against Appellee's wife.

- On October 22, 2012, in response to the email from Appellee's counsel, Smith stated that even though she was in the middle of a "reevaluation" of the cases against Appellee and his wife (which had already caused Smith to recommend and obtain dismissals against Appellee's wife), Smith had been removed from the Hill case effective the previous Friday and was reassigned to the animal cruelty unit.

> **v. No appellate court in Texas has ever ruled that a trial court erred in conducting a hearing on a defendant's motion to dismiss charges on the basis they violated his constitutional rights.**

The dissent is correct in concluding that no appellate court in Texas has ever ruled that a trial court erred in conducting a hearing on a defendant's motion to dismiss charges on the basis they violated his constitutional rights. *Hill*, *id.* at 38-39;

67

*citing State v. Dinur*, 383 S.W.3d 695, 698-699 (Tex. App. Houston [14th Dist.] 2012, *no pet.*) (Trial court allowed hearing); *Rodriguez v. State*, 283 S.W.3d 465, 471-472 (Tex. App. San Antonio 2009) (same); *Galvan v. State*, 988 S.W.2d 291, 293 (Tex. App. Texarkana 1999) (same). Even when the proffer of evidence was very weak and did not establish a colorable claim of a violation, the reviewing court did not find that the trial court abused its discretion by allowing the hearing in the first instance. *See Garcia*, *id.* at 272-274 (In an interference-with-child-custody case, the court of appeals rejected a claim of selective prosecution where the entirety of the proffered and presented evidence was an allegation that another person who fled to Mexico with a child was not prosecuted).

### vi. Texas public policy benefits if trial courts are allowed discretion to determine whether a defendant has made the threshold showing of a colorable claim that the defendant is entitled to a hearing

In Texas, persons accused of crimes obtain formal discovery through: (1) Texas Code of Criminal Procedure Article 39.14; and (2) motions filed under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See* Tex. Code Crim. Proc. Art. 39.14 (2015). Article 39.14 requires disclosure of offense reports and written or recorded statements of the defendant or witnesses. Tex. Code Crim. Proc. 39.14(a) (2015). The State, however, need not release its work product, including those of the prosecutors or its investigators. *Id.*

Under *Brady* and its progeny, the State must disclose material evidence that is favorable to the defendant. Failure to do so results in a violation if: (1) regardless of the prosecutor's good faith or bad faith, the State failed to disclose evidence; (2) the evidence is exculpatory; and (3) the evidence is material to the defense, meaning that there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different (*i.e.*, the defense was prejudiced). *Strickler v. Green*, 527 U.S. 263, 281-282 (1999); *Harm v. State*, 183 S.W.3d 403, 406-407 (Tex. Crim. App. 2006) (same); *Brady*, *id.* at 87; *Moore v. Illinois*, 408 U.S. 786, 794-795 (1972) (same). As the Supreme Court explained in *Brady*, disclosure of exculpatory evidence is necessary to: (1) (avoid) "an unfair trial to the accused"; and (2) "[S]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.* at 87.

However, evidence of selective prosecution is nearly impossible for a defendant to obtain through Article 39.14 or *Brady* because the evidence more than likely is in the hands of the prosecutor who is committing the misfeasance. *See Wayte v. United States*, 470 U.S. 598, 624 (1985) (Marshall, J., dissenting). As Justice Marshall noted, "[The] need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation

of the facts." *Id.* Justice Marshall also recognized that "...most of the relevant proof in selective prosecution cases will normally be in the Government's hands."

And, because of the seriousness of allegations of selective prosecution, especially given that a prosecutor behaving as Watkins did is an affront to the justice system, procedural rules such as limitations of discovery in criminal case should never deprive a defendant of the evidence he needs to substantiate a claim of prosecutorial misconduct. Unfortunately, it is highly unlikely that a prosecutor would ever voluntarily disclose evidence of selective prosecution that violates the Constitution. In fact, if a prosecutor actually made such a disclosure, this would be proof of "actual vindictiveness," which is direct evidence of misconduct under *Goodwin*, 457 U.S. at 380-381. In such a situation, there would be no need for a trial judge to exercise her discretion to order an evidentiary hearing.

It is axiomatic that prosecuting a person because a political ally provided or offered a bribe undermines the integrity of the criminal justice system. Thus, depriving a defendant of discovery and a hearing on a claim of prosecutorial misconduct such as the one before this Court is as unjust as depriving a defendant of *Brady* evidence.

Because trial judges are gatekeepers of evidence, allowing them the discretion to conduct a hearing when a defendant makes a colorable claim of prosecutorial misconduct will eliminate this potential for grave injustice. Such a holding issued

by this Court will not only promote fairness in the criminal justice system, but it is good public policy in Texas.

**vii.** **Most other courts have adopted standards substantially similar to the standard that Appellee argues this Court should adopt: that so long as a defendant attaches a proffer of evidence to a motion to dismiss due to prosecutorial misconduct that the trial court in its discretion determines to present a colorable claim of a constitutional violation, the defendant has attached "some evidence," and the trial court should have the discretion to conduct a hearing on the motion to dismiss.**

**First Circuit:** In *United States v. Penagaricano-Soler*, 911 F.2d 833 (1st Cir. 1990), the court of appeals affirmed the district court's decision to not conduct a hearing because the district court concluded that there was no **"colorable basis"** for the selective prosecution claim, and thus the district court refused to order further discovery, and denied the motion to dismiss. *Id.* at 835-837 (emphasis added). In so affirming, the court of appeals held that a selective prosecution claim merits an evidentiary hearing if it alleges sufficient "facts (1) tending to show that [the defendant] has been selectively prosecuted, and (2) raising a reasonable doubt about the propriety of the prosecution's purpose, unless the government can present 'countervailing reasons.'" *Id.* at 838.

**Second Circuit:** In *United States v. Fares*, 978 F.2d 52 (2d Cir. 1992), the court of appeals held that to warrant discovery with respect to a claim of selective prosecution, a defendant must present at least "**some evidence** tending to show the

71

existence of the essential elements of the defense and that the documents in the government's possession would indeed be probative of these elements." *Id.* at 58 (emphasis added). *Mere assertions* and *generalized proffers on information and belief* are insufficient. *Id.* (emphasis added). As an example, the court of appeals cites *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974), in which the court of appeals held that a proffer of evidence stating that defendant and his attorney "believed" that "there were hundreds" of unprosecuted persons situated similarly to defendant was insufficient for lack of identification of any unprosecuted violators or affiliated organizations. *Id.* at 58. Thus, absent a showing of "some evidence" tending to demonstrate the existence of prosecutorial misconduct, a district court is well within its discretion to deny a motion for discovery and a hearing on a claim of prosecutorial misconduct. *Id.*

**Third Circuit:** In *United States v. Torquato*, 602 F.2d 564 (3d Cir. 1979), *cert. denied*, 444 U.S. 941 (1979), the court of appeals held that in order to obtain a hearing on a claim of prosecutorial misconduct, the defendant must make a threshold showing of discriminatory prosecution before an evidentiary hearing will be allowed. This threshold showing requires the defendant to prove a **"colorable entitlement"** to the claim of selective prosecution. *Id.* at 570 (emphasis added). The court further explained that a **"colorable entitlement"** requires the defendant to provide "some credible evidence...indicating that the government intentionally and

purposefully discriminated against the defendant by failing to prosecute other similarly situated persons." *Id*. (emphasis added).

**Fourth Circuit:** In *United States v. Greenwood*, 796 F.2d 49 (4th Cir. 1986), the court of appeals held that in order to obtain a hearing on a claim of prosecutorial misconduct, a defendant must make a **"nonfrivolous showing"** of both elements of the claim. *Id*. at 52 (emphasis added). A "nonfrivolous showing" is described as allegations that "...raise at least a legitimate issue of improper governmental conduct." *Id*. Further, in determining whether a legitimate issue has been raised, the district court may consider the government's explanation for its conduct. *Id*. Finally, upon a "nonfrivolous showing" by the defendant, a trial court is within its discretion to grant the hearing.

**Sixth Circuit:** In *United States v. Peete*, 919 F.2d 1168 (6th Cir. 1990), the court of appeals affirmed its holding in *United States v. Schmucker*, 815 F.2d 413, 418 (6th Cir. 1987), in which it held that " [a] defendant may...be entitled to discovery on the issue of selective prosecution if he introduces **some evidence** tending to show the existence of the essential elements of the defense." *Id*. at 1177 (emphasis added).

**Seventh Circuit:** In *United States v. Goulding*, 26 F.3d 656 (7th Cir. 1994), *cert. denied*, 513 U.S. 1061 (1994), the court of appeals held that, to obtain discovery on an allegation of prosecutorial misconduct, a defendant must show there

is a **"colorable basis"** for the claim (emphasis added). *Id.* at 662; *see also United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990) (same).

**Ninth Circuit:** In *United States v. Armstrong*, 48 F.3d 1508, 1512 (9th Cir. 1995), the court of appeals held that a trial court is within its discretion to allow a hearing for discovery if a defendant presents evidence providing a colorable basis of selective prosecution.  *See* above.

**Tenth Circuit**: In *United States v. P.H.E., Inc.*, 965 F.2d 848 (10th Cir. 1992), the court of appeals ruled that in order to obtain a hearing on a claim of prosecutorial misconduct, the defendant must show some evidence tending to show the elements. *Id.* at 860.   The court further held, "There is no vindictiveness as long as the prosecutor's decision is based upon the normal factors ordinarily considered in determining what course to pursue, rather than upon genuine animus against the defendant for an improper reason or in retaliation for exercise of legal or constitutional rights." *Id*.  The court further explained that the scope of a reviewing court's inquiry must be "whether, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or punitive animus towards the defendant because he exercised his specific legal right." *Id*.

**Eleventh Circuit:** In *Jones v. White*, 992 F.2d 1548 (11th Cir. 1993), *cert. denied*, 481 U.S. 1055 (1993), the court of appeals held that a defendant may obtain

74

an evidentiary hearing on the issue of selective prosecution or other prosecutorial misconduct if the defendant "presents facts sufficient to raise a reasonable doubt about the prosecutor's motive." *Id*. at 1572.

**D.C. Circuit:** In *Attorney General of United States v. Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1172 (1983), the court of appeals held that a district court in its discretion may require a defendant to make a **"colorable claim"** of prosecutorial misconduct before subjecting the government to discovery on the issue. *Id*. at 947 (emphasis added).

Appellee notes for this Court that the Eighth Circuit in *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1993) and the Fifth Circuit in *United States v. Johnson*, 577 F.2d 1304, 1309 (5th Cir. 1978) held that to obtain a discovery hearing on a claim of prosecutorial misconduct, a defendant must first make a *prima facie* showing that the government acted inappropriately.   Although Appellee disagrees with the standard set forth by the Fifth and Eight Circuits, Appellee notes that the analysis for his case does not change, as Appellee not only attached "some evidence" showing a constitutional violation, but in fact attached "exceptionally clear evidence" that constitutes a *prima facie* case of prosecutorial misconduct.   Still, Appellee asks this Court to not adopt this standard for Texas.

**viii.      This Court should  affirm the trial court's order dismissing the indictments because the evidence obtained during the March 7, 2013 hearing overwhelmingly proved that: (1) Watkins singled out Appellee for prosecution and has not proceeded against others similarly situated based on the type of conduct for which Appellee was charged; and (2) Watkins's discriminatory selection was invidious and resulted from allowing himself to be improperly influenced by Blue.**

The evidence obtained during the March 7, 2013 hearing is set forth in great detail over the span of 20 pages in section VIII above.  Appellee will not recount those facts here.  However, this Court will find that the evidence obtained so overwhelmingly proved that: (1) Watkins singled out Appellee for prosecution and has not proceeded against others similarly situated based on the type of conduct for which Appellee was charged; and (2) Watkins's discriminatory selection was invidious and resulted from allowing himself to be improperly influenced by Blue, that this Court should affirm the trial court's order dismissing the indictments.

### ix. Conclusion

To establish a *prima facie* case of selective prosecution in violation of the Fifth and Fourteenth Amendments, and to obtain a hearing under the "presumption of prosecutorial vindictiveness" method, a defendant must provide "some evidence" that shows: (1) the government singled out the defendant for prosecution and has not proceeded against others similarly situated based on the type of conduct for which the defendant is charged; and (2) the government's discriminatory selection

is invidious. Once the defendant makes this showing, the burden shifts to the State to justify the discriminatory treatment.

Appellee has shown why this Court should clarify what constitutes "some evidence" and hold that so long as a defendant attaches a proffer of evidence to a motion to dismiss due to prosecutorial misconduct, the trial court in its discretion determines to present a colorable claim of a constitutional violation, the defendant has attached "some evidence," and the trial court should have the discretion to conduct a hearing on the motion to dismiss. Appellee has also shown why this Court should find that Appellee not only attached "some evidence" showing a constitutional violation, but in fact attached "exceptionally clear evidence."

Appellee has also shown this Court that the Court of Appeals erred when it: (1) sustained the State's second issue and concluded that Appellee "did not make the proper showing sufficient to establish a *prima facie* case..." of the fact that the former elected district attorney of Dallas County engaged in prosecutorial misconduct by allowing himself to be corruptly influenced by a political ally in return for indicting Appellee; (2) found that the trial court erred in conducting a hearing on Appellee's motion to dismiss based upon prosecutorial misconduct; (3) vacated the trial court's Order Granting Motion to Dismiss; and (4) remanded the case to the trial court to reinstate the indictments against Appellee.

As a result, (1) the decision of the Court of Appeals conflicts with another court of appeals' decision on the same issue; (2) the Court of Appeals has decided an important question of state or federal law that has not been, but should be, settled by the Court of Criminal Appeals; (3) the Court of Appeals has decided an important question of state or federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals and the Supreme Court of the United States; (4) the Court of Appeals misconstrued a rule; and (5) the justices of the Court of Appeals have disagreed on a material question of law necessary to the court's decision. *See* Tex. Rule App. Proc. 66.3 (2015).

## XI. Conclusion and Prayer

For the reasons stated in this Brief, Appellee respectfully prays that this Court reverse the judgment and opinion of the Court of Appeals, find that Appellee provided "some evidence" constituting a colorable claim that allowed the trial court to exercise its discretion to order a hearing, and affirm the trial court's *Order Granting Motion to Dismiss*.

Respectfully submitted,

George R. Milner III
Milner Finn Price
2828 N. Harwood St. Suite 1950
Dallas, Texas 75201
Phone: 214-651-1121
Fax: 214-953-1366
ItsRainingII@aol.com
Texas Bar No. 00784611
Attorney for Appellee

Leonard Thomas (Butch) Bradt
14015 Southwest Freeway Suite 4
Sugar Land, TX 77478
Phone: 972-201-0700
Fax: 972-201-1202
ltbradt@flash.net
Texas Bar No. 02841600
Attorney for Appellee

Michael Mowla
445 E. FM 1382 No. 3-718
Cedar Hill, Texas 75104
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Appellee

**/s/ Michael Mowla**
By: Michael Mowla

## XII.  Certificate of Service

I certify that on July 24, 2015, a true and correct copy of this document was served on Chad Baruch by email to baruchesq@aol.com, on Lisa McMinn, the State Prosecuting Attorney, by email to Lisa.McMinn@spa.texas.gov, and on John Messinger, Assistant State Prosecuting Attorney, by email to john.messinger@spa.state.tx.us.  *See* Tex. Rule App. Proc. 9.5 (2015) and Tex. Rule App. Proc. 68.11 (2015).

**/s/ Michael Mowla**
By: Michael Mowla

## XIII.  Certificate of Compliance with Tex. Rule App. Proc. 9.4

This certifies that this document complies with the type-volume limitations because this document is computer-generated and does not exceed 15,000 words. Using the word-count feature of Microsoft Word, the undersigned certifies that this document contains 14,720 words in the document *except* in the following sections: caption, identity of parties and counsel, table of contents, table of authorities, statement of the case and jurisdiction, statement regarding oral argument, statement of issues or questions presented, signature, proof of service, certification, certificate of compliance, and appendix. This document also complies with the typeface requirements because it has been prepared in a proportionally-spaced typeface using 14-point font. *See* Tex. Rule App. Proc. 9.4 (2015).

**/s/ Michael Mowla**
By: Michael Mowla

# APPENDIX

Ⓐ Neutral

As of: February 14, 2015 8:05 AM EST

# *State v. Hill*

Court of Appeals of Texas, Fifth District, Dallas

December 29, 2014, Opinion Filed

No. 05-13-00421-CR, No. 05-13-00423-CR, No. 05-13-00424-CR, No. 05-13-00425-CR

**Reporter**

2014 Tex. App. LEXIS 13835

THE STATE OF TEXAS, Appellant v. ALBERT G. HILL III, Appellee

**Notice:** PLEASE CONSULT THE TEXAS RULES OF APPELLATE PROCEDURE FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** [*1] On Appeal from the 204th Judicial District Court, Dallas County, Texas. Trial Court Cause Nos. F11-00180-Q, F11-00182-Q, F11-00183-Q, F11-00191-Q.
*In re Watkins, 2013 Tex. App. LEXIS 4194 (Tex. App. Dallas, Apr. 2, 2013)*

## Core Terms

indictments, trial judge, prosecute, evidentiary hearing, charges, district attorney's office, allegations, trial court, motion to dismiss, vindictiveness, campaign, prima facie case, cases, discovery, exhibits, grand jury, animus, constitutional right, phone call, fee-dispute, constitutional violation, attorneys', documents, donated, deposition, motion to quash, prosecutorial, notice, district attorney, communications

## Case Summary

### Overview

HOLDINGS: [1]-The charges against defendant should not have been dismissed where the trial judge erred in conducting a hearing on defendant's motion to dismiss because defendant did not make the proper showing sufficient to establish a prima face case of his alleged constitutional violations; [2]-The trial judge granted defendant an evidentiary hearing so that he could try to prove that he was prosecuted in violation of his constitutional rights, but by conducting that evidentiary hearing before defendant met the evidentiary threshold, the judge turned the standard around and put the burden on the State to show why the prosecutor was not operating under a conflict of interest and how the prosecution of defendant was not vindictive or selective.

### Outcome

Order vacated and cases remanded.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Deferential Review > General Overview

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > General Overview

Criminal Law & Procedure > Trials > Judicial Discretion

Criminal Law & Procedure > ... > Standards of Review > Deferential Review > General Overview

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > General Overview

Criminal Law & Procedure > Trials > Judicial Discretion

*HN1* While an appellate court ordinarily defers to a trial judge's decision to hold an evidentiary hearing, that deference is tempered by the legal principles and standards governing evidentiary hearings. A judge's decision to hold an evidentiary hearing is reviewed for an abuse of discretion. *Tex. Code Crim. Proc. Ann. arts. 28.01, § 1(2)*, *27.02(1)* (2006).

Criminal Law & Procedure > ... > Accusatory Instruments > Dismissal > Procedure

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > ... > Dismissal > Grounds for Dismissal > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Counsel > Prosecutors

Evidence > ... > Presumptions > Particular Presumptions > Regularity

Criminal Law & Procedure > ... > Accusatory Instruments > Dismissal > Procedure

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > ... > Dismissal > Grounds for Dismissal > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Counsel > Prosecutors

Evidence > ... > Presumptions > Particular Presumptions > Regularity

*HN2* Generally, a trial judge has only limited authority to dismiss a case without the State's consent, such as to remedy a constitutional violation. And while a trial judge may dismiss an indictment where constitutional protections are not observed, the dismissal of an indictment is a drastic measure only to be used in the most extraordinary circumstances. A trial judge's limited authority to dismiss an indictment stems in part from the fact that the decision of whether to prosecute is a core executive constitutional function. Because this power is within the province of the State, the State enjoys considerable discretion in deciding whether or not to prosecute and what charge to file or bring to the grand jury. That means courts presume the State exercised its prosecutorial responsibilities in good faith and in compliance with the Constitution. The burden on the defendant to show that a particular prosecutorial decision was predicated on constitutionally impermissible grounds is high, requiring him to prove his claim with clear evidence.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Counsel > Prosecutors

Evidence > ... > Presumptions > Particular Presumptions > Regularity

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

Criminal Law & Procedure > Commencement of Criminal Proceedings > Counsel > Prosecutors

Evidence > ... > Presumptions > Particular Presumptions > Regularity

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

*HN3* The significance of the presumption courts afford prosecutors carries over to a defendant's request for an evidentiary hearing or discovery. That is, in light of the presumption of prosecutorial regularity, a defendant who claims his constitutional rights were violated by some form of prosecutorial misconduct must make out a prima facie case of his claims before he is entitled to an evidentiary hearing or discovery. To do this, a defendant must present facts sufficient to create a reasonable doubt about the constitutionality of his prosecution. The facts required to cast doubt about the constitutionality of the prosecution and to rebut the presumption the State acted in good faith such that a person is entitled to an evidentiary hearing (or even discovery) must be more than allegations. Rather, a defendant's factual allegations must be accompanied by evidence that tends to establish his constitutional claims. Indeed, the standard for obtaining discovery on claims like selective or vindictive prosecution requires some evidence tending to show the existence of the essential elements of the claimed violations. This standard is rigorous and complements the rigorous standard for proving constitutional violations in the decision to prosecute.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Tests for Prosecutorial Misconduct

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Tests for Prosecutorial Misconduct

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

*HN4* The absence of an impartial and disinterested prosecutor can violate a defendant's due process rights. Partiality in this context is like a conflict of interest in the sense that the prosecutor has a personal interest or stake in the outcome of the criminal prosecution. It also refers to any interest that conflicts with the prosecutor's duty to seek justice. Thus, the due process rights of a defendant are violated when a prosecuting attorney who has a conflict of interest relevant to the defendant's case prosecutes the defendant. The mere potential or perceived conflict of interest is not sufficient to establish a due process violation. Similarly, mere allegations of wrongdoing do not suffice.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

*HN5* "Prosecutorial vindictiveness" refers to a situation in which the State acts against a defendant by bringing criminal charges in retaliation for the defendant's exercise of his legal rights. A prosecutorial action is vindictive if it is designed to penalize a defendant for invoking legally protected rights. A defendant may demonstrate prosecutorial vindictiveness by showing actual vindictiveness, which requires him to present objective evidence of the violation. Or, in certain circumstances, the defendant may rely on a presumption of vindictiveness, which requires him to present facts showing the realistic likelihood of vindictiveness, forcing the State to present objective evidence justifying the prosecutorial action. There is no presumption of vindictiveness if in the context of the entire proceedings any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision was motivated by some purpose other than a vindictive desire to deter or punish. Even if the defendant establishes a realistic likelihood of vindictiveness, the State still has an opportunity to proffer legitimate, objective reasons for its conduct.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

*HN6* Evidence of suspicious timing alone does not indicate prosecutorial animus.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

Constitutional Law > Equal Protection > Nature & Scope of Protection

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

Constitutional Law > Equal Protection > Nature & Scope of Protection

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

*HN7* A selective prosecution claim is an assertion that the State brought charges for reasons forbidden by the Constitution. A selective-prosecution claim draws on ordinary equal protection standards and requires a defendant to prove the existence of purposeful discrimination. To make out a prima facie case, the defendant must first show that he has been singled out for prosecution while others similarly situated and committing the same acts have not been prosecuted. He must also show that the State's discriminatory selection of him for prosecution was invidious or in bad faith.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Burdens of Proof

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Selective & Vindictive Prosecution

*HN8* There is an evidentiary threshold that must be met by the defendant before he is entitled to an evidentiary hearing on his claims that he was prosecuted in violation of his constitutional rights. That burden requires a defendant to do more than make unsupported allegations or speculative inferences about an improper motive. Stated another way, before a defendant gets to make inquiries into the State's decision to prosecute, the defendant must support his allegations with evidence that tends to establish his constitutional claims. A defendant may demonstrate prosecutorial vindictiveness by showing actual vindictiveness, which requires him to present objective evidence of the violation. Or, in certain circumstances, the defendant may rely on a presumption of vindictiveness, which requires him to present facts showing the realistic likelihood of vindictiveness, forcing the State to present objective evidence justifying the prosecutorial action. There is no presumption of vindictiveness if in the context of the entire proceedings any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision was motivated by some purpose other than a vindictive desire to deter or punish.

**Counsel:** for appellants: Michael R. Casillas, Dallas, TX; Charles "Chad" Baruch, Rowlett, TX.

for appellees: George Milner III, Dallas, TX; John C. Hueston, NewPort Beach, CA; Marshall Camp, Alison Plessman, Los Angeles, CA; Michael Mowla, Cedar Hill, TX.

**Judges:** Before Justices Bridges, O'Neill, and Brown. Opinion by Justice Brown. Bridges, J., dissenting.

**Opinion by:** ADA BROWN

## Opinion

Opinion by Justice Brown

On March 31, 2011, a Dallas grand jury returned multiple indictments against Albert G. Hill III and his wife for the offenses of making a false statement to obtain property or credit and securing execution of a document by deception.[1] The charges allegedly arose out of the Hills' procurement of a $500,000 home-equity loan in 2009. The State later dismissed the charges against Hill's wife and continued to prosecute the cases against Hill. In a motion filed shortly after the dismissal of his wife's charges, Hill sought to quash and dismiss the indictments against him, alleging he was the victim of various forms of prosecutorial misconduct in violation of his constitutional rights. Alternatively, he asked for an evidentiary hearing and discovery to develop the issues presented in his motion. Over the State's objections, the trial judge determined that Hill met his initial burden of proof related to his constitutional [*2] claims and therefore was entitled to a hearing "to try to prove" his allegations. After the judge held a hearing, the judge signed an order dismissing the indictment in each case with prejudice.

The State appeals that order. In its first two issues, the State challenges the propriety of the evidentiary hearing, arguing that Hill was not entitled to such a hearing because he failed to provide evidence to establish a constitutional violation. In its third and fourth issues, the State challenges the trial judge's (1) dismissal of the indictments based on the Dallas County District Attorney's refusal to testify at the hearing and (2) decision to dismiss the indictments with prejudice.

We agree with the State that the trial judge erred in conducting an evidentiary hearing on Hill's motion to quash and dismiss the indictments because Hill did not make the necessary showing related to his constitutional claims. Accordingly, we vacate the trial judge's order dismissing the indictments in these cases and remand the cases to the trial court with instructions to reinstate the indictments against Hill.

**I**.

### A. Hill's Allegations of Prosecutorial Misconduct

Hill [*3] sought pretrial dismissal of the indictments based on alleged violations of his constitutional rights to due process and equal protection. He first alleged that his due process rights were violated because the Dallas County District Attorney, Craig Watkins, was not disinterested in the prosecution of him but rather was operating under the influence of Hill's father, who was adverse to Hill in contested litigation involving a multi-billion dollar family trust, and Lisa Baron Blue, a close friend and political patron of Watkins. Hill argued Watkins's decision to present the cases to the grand jury was influenced by the payment of political contributions. Hill also alleged that a due process violation

---

[1] *See* Tex. Penal Code Ann. §§ 32.32(b), 32.46(a) (West 2011).

occurred because Watkins's decision to prosecute him was vindictive, asserting that the State brought the charges in retaliation for Hill having exercised his right to petition the civil courts. His third allegation was that he was selectively prosecuted in violation of his equal protection rights.

Hill based his allegations of prosecutorial misconduct on a series of "facts" that he presented in his motion. Hill stated that it was his father's lawyer, Michael Lynn, who filed the complaint [*4] with the DA's office accusing Hill and his wife of mortgage fraud. The complaint was submitted to the DA's office in February 2010, while the trust litigation was still pending and days after Hill's father received an adverse ruling in that case. The next month, Watkins received a series of campaign donations from Jeffrey Tillotson, a law partner at Lynn's firm. Hill asserted that neither Tillotson nor anyone at that firm had previously donated to Watkins's campaigns. The donations totaled $48,500, with the last donation made five months before the Hills were indicted.

Hill also asserted that the mortgage-fraud allegations were "highly unusual" because the home-equity loan was not in default and was repaid in full shortly after the loan was obtained. According to Hill, the lender did not suffer a loss and had not complained about any wrongdoing. In addition, Hill claimed the DA's office did not conduct a standard investigation because it failed to interview certain witnesses. Nor did the DA's office notify him that indictments were being considered despite Hill's claim that the DA's office had a policy of providing notice and giving the accused's lawyers an opportunity to address the [*5] grand jury before charges are presented.

Hill further complained that the timing of the indictments was suspect. In particular, Hill claimed the indictments were returned two weeks before the Hills were to begin trial in a fee dispute with the lawyers that represented them in the trust litigation, one of whom was Blue. Hill explained that after the trust litigation settled, the Hills contested the amount of attorneys' fees sought by Blue and the other lawyers. The lawyers filed suit, maintaining the Hills owed over $50 million in attorneys' fees. Hill stated that because of the pending indictments, the Hills asserted their Fifth Amendment privilege against self-incrimination and did not testify in the fee-dispute litigation.

Hill emphasized that Blue exchanged numerous phone calls and text messages with Watkins and his assistant in the weeks before the indictments were returned. Hill also pointed out that Blue donated money to Watkins's campaign and held a social event at her home to raise money for the campaign during that same time frame. Hill alleged that the pattern of phone calls and text messages between Blue and Watkins revealed a "dramatic spike" in communications in the weeks before the indictments [*6] were returned and that the "heated exchange of calls" between Blue and Watkins ended after the indictments were announced. Further, in a deposition conducted after the conclusion of the fee-dispute trial, Hill claimed that Blue admitted that two of those phone calls from Watkins were about the indictments before the indictments were returned. Hill also claimed that during Blue's representation of the Hills in the trust litigation, Blue "bragged" to him about her relationship with Watkins. Hill stressed that this was not "idle bragging" and that Blue has a "very close personal, professional and political relationship" with Watkins as represented by Blue's status as one of Watkins's largest individual donors, Blue's pro bono representation of Watkins in connection with an unrelated lawsuit, Blue's $100,000 donation to SMU law school to create a scholarship in Watkins's name, and the fact that Watkins hired Blue and another attorney to represent Dallas County in a contingent-fee suit.

Hill finally claimed that the DA's office "apologized" to the Hills on behalf of the DA's office, and he proclaimed that with the dismissal of the charges against his wife, the office "effectively

acknowledge[ed] the wrongfulness [*7] of those charges." According to Hill, the Hills' defense counsel met with Assistant District Attorney Deborah Smith in October 2012. Hill maintained that during that meeting, Smith "expressed significant concerns" about the charges and "stated that she would refuse to try the case if the DA's Office decided to go forward on any of the charges." Hill also maintained that Smith said that based on her re-evaluation of the cases, she decided to recommend dismissing certain charges against the Hills and was conducting due-diligence interviews related to the remaining charges. Shortly after the meeting, Smith communicated that she was reassigned to another division. Hill called this "remarkable news" given that Smith was in the middle of her re-evaluation of the charges against the Hills.

Hill argued the circumstances presented by these "facts" constitute "clear and appalling" violations of his constitutional rights and establish that the DA's office served as a "stalking horse" for the interests of (1) Hill's father, who Hill maintained reported the allegations of mortgage fraud in retaliation for his "exercise of his constitutional rights in the trust litigation"; (2) Lynn, who submitted [*8] the mortgage-fraud allegations to the DA's office and whose law partner donated $48,500 to Watkins's campaign; and (3) Blue, Watkins's friend and generous campaign contributor, who was seeking millions of dollars in attorneys' fees from the Hills at the time the indictments were returned. Hill maintained that the charges "had the desired effect" by impairing the Hills' ability "to exercise their constitutional rights to defend themselves" in the fee-dispute litigation involving Blue.

### B. Hill's Proffer of Evidence in Support of His Motion

As support, Hill attached forty-four exhibits to his motion, most of which were unauthenticated or not otherwise identified by affidavit testimony. Those exhibits included what appeared to be a page from Lynn's February 2010 complaint, various pleadings, excerpts from Watkins's campaign finance reports, e-mail exchanges among counsel in the trust litigation, Blue's telephone records, a log of text messages between Blue and Watkins and his assistant, announcements about the SMU scholarship funded by Blue and about Watkins's hiring of Blue to help in unrelated litigation, a printout of a 2007 *Texas Lawyer* article about the office's grand jury policy, and [*9] Smith's e-mail about her reassignment. Hill also attached what appeared to be excerpts from (1) transcripts in the fee-dispute litigation related to the Hills' request for a continuance and their assertion of their Fifth Amendment privilege and (2) deposition testimony from (a) Blue in the fee-dispute litigation in which she testified to receiving two phone calls from Watkins about the indictments of the Hills and (b) Blue's co-counsel in the trust litigation, Stephen Malouf, who testified to overhearing one of those conversations.

### C. The State's Response to Hill's Motion

The State filed a brief opposing the motion to quash and dismiss the indictments. The State argued the trial judge lacked the authority to grant Hill's motion because Hill failed to prove any constitutional violation. The State also emphasized that Hill's prosecution was not "the product of a favored and discontented campaign donor's audience with the District Attorney." Rather, the State asserted that the investigation into the offense began with the letter from Lynn, was investigated by an experienced prosecutor, and the decision to pursue charges against Hill was not unusual or exceptional given that the Specialized Crime Division [*10] of the DA's office regularly prosecutes cases like Hill's.

The State supported its opposition with various exhibits, including the affidavits of Assistant District Attorneys Donna Strittmatter and Stephanie Martin. Strittmatter testified that as the assigned

prosecutor within the Specialized Crime Division, she received Lynn's February 2010 complaint and supporting documents, alleging numerous fraudulent acts committed by Hill in connection with a loan transaction. Strittmatter assigned the case to Martin to conduct an investigation. Martin testified that she personally investigated the allegations against Hill and her investigation included receiving large volumes of documents from the bank and title company. Martin also obtained deposition testimony of Hill and others, and she spoke to legal counsel from the bank. Strittmatter confirmed that Martin investigated the case for several months and provided updates to her as Martin reviewed the evidence.

Martin also testified that the Specialized Crime Division within the DA's office regularly prosecutes crimes similar to those alleged to have been committed by Hill. She explained that many of the indictments the division obtains for the **[*11]** same crime involve property or credit valued at $200,000 or more. She said she personally prosecuted four mortgage-fraud cases involving circumstances where no loss was suffered.

Both Strittmatter and Martin testified that they did not have a practice of notifying a suspect that he is the target of a criminal investigation. Martin also stated that it was not her practice to provide a suspect with an opportunity to be heard by the grand jury before indictment. Both also testified that they were unaware of the fee-dispute litigation between Blue and the Hills.

### D. The Trial Judge Sets the Motion to Dismiss for a Hearing

In advance of the hearing on his motion, Hill served subpoenas on various individuals from the DA's office, including Watkins, Moore, Martin, and Strittmatter. He also served subpoenas on Blue, Malouf, and Charla Aldous, who was Blue's other co-counsel representing the Hills in the trust litigation. The State responded with motions to quash the subpoenas, raising procedural objections and arguing, among other things, that Hill was not entitled to seek information from the individuals because Hill's motion to quash and dismiss the indictments was invalid. The State argued **[*12]** that Hill's motion did not allege (1) that Watkins placed Hill in an arbitrary classification in determining whether to indict him, (2) any cognizable retaliation by Watkins, or (3) any alleged exercise of Hill's legal rights. The State also stressed that Hill did not "even allege a lack of objective basis to indict." The State maintained that because these infirmities were fatal to Hill's motion to quash and dismiss the indictments, the State could not be burdened to comply with Hill's subpoenas.

### E. The Trial Judge Grants Hill an Evidentiary Hearing

The trial judge heard argument on Hill's motion on February 14, 2013. Although the judge stated that she did not "understand how [Hill was] gonna get there" based on the type of evidence Hill explained would be "elicit[ed]" and would "come out" in the examinations of Watkins and Blue, she granted Hill the "right to have a hearing to try to prove to the Court that this case was handled differently from any other case" that would come before the DA. The judge also determined that Hill presented prima facie evidence of his claims and that he had a "right to make inquiries" to "make [his] case."[2]

---

[2] At the time she made this determination, the judge had Hill's **[*13]** motion plus the attachments to his motion, the State's opposition to Hill's motion, which included various attachments and the affidavits of Strittmatter and Martin, and Hill's brief in reply. The judge also had the various motions to quash the subpoenas served by Hill, Hill's opposition to those motions, and an affidavit, dated February 12, 2013, filed by Blue in support of her motion for protective order regarding the subpoena to appear at the hearing.

The State asked the judge for time to appeal the ruling, arguing that Hill was not entitled to a hearing at this point because he failed to establish a prima facie case for his constitutional claims. The State further objected to the hearing on the basis that Hill was trying to develop evidence that he did not have. The judge overruled the State's objections. The State also sought mandamus relief from this Court and a stay of the hearing from the Texas Court of Criminal Appeals. In its mandamus petition, the State complained, among other things, about the judge's finding that Hill established a prima facie case.

The trial judge conducted an evidentiary hearing related to Hill's motion to quash and dismiss the indictments while the State's [*14] requests for relief were pending. On March 7, 2013, the judge signed the order dismissing the indictments with prejudice on the basis that Hill had been denied "his right to a full and fair hearing on his motion" due to Watkins's refusal to testify at the hearing. We ultimately dismissed the State's petition for writ of mandamus as moot on April 2, 2013.[3]

## II.

The State's first two issues relate to the trial judge's decision to hold an evidentiary hearing. *HN1* While we ordinarily defer to a trial judge's decision to hold an evidentiary hearing,[4] that deference is tempered by the legal principles and standards governing evidentiary hearings as outlined below. *See, e.g., United States v. Webster, 162 F.3d 308, 334 (5th Cir. 1998)* (defendant "not automatically entitled to an evidentiary hearing to make the required showing").

*HN2* Generally, a trial judge has only limited authority to dismiss a case without the State's consent, such as to remedy a constitutional [*15] violation. *State v. Mungia, 119 S.W.3d 814, 816-17 (Tex. Crim. App. 2003)*. And while a trial judge may dismiss an indictment where constitutional protections are not observed, "the dismissal of an indictment is 'a drastic measure only to be used in the most extraordinary circumstances.'" *Id. at 817* (quoting *State v. Frye, 897 S.W.2d 324, 330 (Tex. Crim. App. 1995))*.

A trial judge's limited authority to dismiss an indictment stems in part from the fact that the decision of whether to prosecute is a core executive constitutional function. *United States v. Armstrong, 517 U.S. 456, 464-65, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)*. Because this power is within the province of the State, the State enjoys considerable discretion in deciding whether or not to prosecute and what charge to file or bring to the grand jury. *Id. at 464* ("In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'") (quoting *Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978))*; *see also Wayte v. United States, 470 U.S. 598, 607, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985)* (recognizing that "the decision to prosecute is particularly ill-suited to judicial review"); *Neal v. State, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004)*. As a result of that discretion, our consideration of Hill's claims begins with a "presumption of regularity." *Armstrong, 517 U.S. at 464* (courts presume prosecutors have "properly discharged their official duties"). That [*16] means we presume the State

---

[3]   *See In re Watkins, Nos. 05-13-00298-CV, 05-13-00299-CV, 05-13-00300-CV, 05-13-00301-CV, 05-13-00302-CV, 2013 Tex. App. LEXIS 4194, 2013 WL 1363766, at *1 (Tex. App.—Dallas Apr. 2, 2013, orig. proceeding)* (mem. op.).

[4]   A judge's decision to hold an evidentiary hearing is reviewed for an abuse of discretion. *See* Tex. Code Crim. Proc. Ann. art. 28.01, § 1(2) (West 2006); *see also id*. art. 27.02(1).

exercised its prosecutorial responsibilities in good faith and in compliance with the Constitution. *Id. at 465-66*; *Neal, 150 S.W.3d at 173*. The burden on the defendant to show that a particular prosecutorial decision was predicated on constitutionally impermissible grounds is high, requiring him to prove his claim with ″clear evidence.″ *Armstrong, 517 U.S. at 465*; *Webster, 162 F.3d at 334*; *see also Garcia v. State, 172 S.W.3d 270, 274 (Tex. App.—El Paso 2005, no pet.)* (stating that an appellant ″claiming selective prosecution must come forth with 'exceptionally clear evidence' that the prosecution was initiated for an improper reason″).

*HN3* The significance of the presumption courts afford prosecutors carries over to a defendant's request for an evidentiary hearing or discovery. *See Webster, 162 F.3d at 334* (″A defendant is not automatically entitled to an evidentiary hearing to make the required showing.″); *see also Armstrong, 517 U.S. at 464* (noting that because prosecutors are afforded a ″background presumption,″ the necessary showing ″to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims″). That is, in light of the presumption of prosecutorial regularity, a defendant who claims his constitutional rights were violated by some form of prosecutorial misconduct must make out a prima facie case of his claims *before* he **[*17]** is entitled to an evidentiary hearing or discovery. *See In re United States, 397 F.3d 274, 284 (5th Cir. 2005)*; *Webster, 162 F.3d at 334*. To do this, a defendant must ″present facts 'sufficient to create a reasonable doubt about the constitutionality of [his] prosecution' . . . .″ *Webster, 162 F.3d at 334* (quoting *United States v. Jennings, 724 F.2d 436, 445-46 (5th Cir. 1984))*. The ″facts″ required to cast doubt about the constitutionality of the prosecution and to rebut the presumption the State acted in good faith such that a person is entitled to an evidentiary hearing (or even discovery) must be more than allegations. *See Jennings, 724 F.2d at 445-46* (motion containing broad, generalized allegations did not offer facts to the court to warrant evidentiary hearing); *see also Wade v. United States, 504 U.S. 181, 186, 112 S. Ct. 1840, 118 L. Ed. 2d 524 (1992)* (stating that ″generalized allegations of improper motive″ are not enough to entitle a defendant to a remedy, discovery, or evidentiary hearing); *United States v. Sanchez, 517 F.3d 651, 671 (2d Cir. 2008)* (″Generalized allegations of improper motive do not disturb the presumption of regularity.″). Rather, a defendant's factual allegations must be accompanied by *evidence* that tends to establish his constitutional claims. *See Jennings, 724 F.2d at 445-46* (after reviewing affidavit and statement offered in support of motion to quash, court unable to conclude Jennings presented facts sufficient to create reasonable doubt about the selectivity of his prosecution). Indeed, the standard for **[*18]** obtaining discovery on claims like selective or vindictive prosecution requires ″some evidence tending to show the existence of the essential elements″ of the claimed violations. *Armstrong, 517 U.S. at 468*; *see also In re United States, 397 F.3d at 284* (prima facie case ″requires the criminal defendant to *bring forward some evidence*″) (emphasis added). This standard is ″rigorous″ and complements the ″rigorous standard″ for proving constitutional violations in the decision to prosecute. *Armstrong, 517 U.S. at 468*.

## III.

In its first issue, the State complains about the documents Hill proffered with his motion. The State argues that Hill needed to present evidence to support his claims before he was entitled to an evidentiary hearing and, because Hill ″simply made unsworn allegations″ in his motion and ″attached a stack of unauthenticated documents″ as exhibits, he basically provided no evidence to support his claims. The State explains that, under *Armstrong*, the judge had to presume that Watkins acted in good faith until Hill presented clear evidence to the contrary and the presentation of such evidence was a condition that must be met before Hill was entitled to an evidentiary hearing. The State points out that

even the trial judge advised Hill that the "unauthenticated, [*19] un-introduced documents attached to his motion" were not evidence.[5] Hill responds that the State did not preserve its complaint that Hill's attachments to his motion suffered from authentication or hearsay problems because the State did not object on those bases in the trial court. Hill also asserts the State stipulated to the authenticity and admissibility of the evidence attached to the motion at the March 7 evidentiary hearing.

While we are troubled by the unsworn allegations in and authenticity of the documents attached to Hill's motion,[6] we need not resolve whether the State preserved its complaint about these documents[7] because regardless of the contentions the State raised in its first issue, we conclude Hill did not meet the standard required to warrant an evidentiary hearing even when we consider the documents attached to Hill's motion. Before Hill is entitled to an evidentiary hearing, he must make a prima facie showing for his alleged constitutional claims with evidence capable of dispelling [*20] the presumption that the prosecution of him was in good faith and in compliance with the Constitution. See *Armstrong, 517 U.S. at 465*; *In re United States, 397 F.3d at 284*. Hill's failure to do so means the trial judge erred in granting Hill an evidentiary hearing, which resulted in the dismissal of the indictments. This is the State's second issue.

**IV**.

This case came to us with a large record. But in deciding the issue of whether Hill was entitled to an evidentiary hearing to try to prove his allegations, there is no need to look beyond what the trial judge had in her hands at the time she decided that Hill met his initial burden of proof related to his constitutional claims. In particular, we consider Hill's motion and the attached exhibits to determine whether he made a prima facie case for each of [*21] his claims such that he was entitled to an evidentiary hearing.

In his motion to quash and dismiss the indictments, Hill claimed he was deprived of his right to a disinterested prosecutor and that he had been vindictively and selectively prosecuted. As proof of the alleged constitutional violations, Hill emphasized the following in his motion: (1) political contributions from a lawyer associated with Hill's father in the months after the February 2010 complaint and five months before the indictments were returned and a donation by Blue less than a month before the indictments were returned; (2) that Blue hosted a fundraiser for Watkins in the month before the indictments were returned; (3) the "unusual" nature of the charges against him; (4) the lack of notice to him that indictments were being considered; (5) the suspect timing of the indictments in that they were returned just before the fee-dispute trial involving Blue, which Hill claimed prevented him and his wife from testifying in that trial; (6) the "heated exchange" of communications with Watkins and his office in the weeks leading up to the Hills' indictments and ending after the indictments were returned; (7) Blue's discussion [*22] about indictments with Watkins in the time before they were

---

[5] The judge's statement was made at a hearing conducted on March 4, 2013. Specifically, the judge alerted Hill's defense counsel that the "exhibits on [Hill's] motions [were] not evidence."

[6] In our view, the evidence accompanying a motion alleging prosecutorial misconduct must be competent evidence; the evidence must be properly authenticated and in an otherwise admissible format. Affidavits or sworn or other reliable witness statements are appropriate to establish a fact.

[7] The State argues it had no reason to object before the commencement of the hearing because Hill had not yet offered the documents attached to his motion as evidence.

returned; (8) Blue's comment made in her deposition that she would have no reason to discuss indictments with Watkins after they were returned; (9) Blue's close relationship with Watkins; (10) defense counsel's meeting with Smith about the charges; and (11) the fact that charges against Hill's wife were dismissed. Hill contends on appeal that these facts cast doubt on the constitutionality of the prosecution and not only entitle him to an evidentiary hearing but also establish a prima facie showing of prosecutorial misconduct.

## A. Hill's Allegation He Was Deprived of the Right to a Disinterested Prosecutor

Hill first alleged in his motion that the indictments should be dismissed because he was deprived of the right to a disinterested prosecutor. *HN4* The absence of an impartial and disinterested prosecutor can violate a defendant's due process rights. *In re Guerra, 235 S.W.3d 392, 429 (Tex. App.—Corpus Christi 2007, orig. proceeding)*. "Partiality" in this context is like "a conflict of interest in the sense that the prosecutor has a personal interest or stake in the outcome of the criminal prosecution." *Id. at 430*. It also refers to any interest that conflicts with the prosecutor's duty to seek justice. *Id*. Thus, the due [*23] process rights of a defendant are violated "when a prosecuting attorney who has a conflict of interest relevant to the defendant's case prosecutes the defendant." *Id. at 429*. The "mere potential or perceived conflict of interest" is not sufficient to establish a due process violation. *Id. at 430*. Similarly, mere allegations of wrongdoing do not suffice. *Id*.

Hill alleged in his motion that the influence exercised upon Watkins by Hill's father, Lynn, and Blue deprived him of due process. He explained that Watkins had "a financial stake in the prosecution of the Hills" because indicting them benefited Blue (who was involved in a dispute with the Hills over attorneys' fees) and Tillotson (who also was a major campaign contributor), "which in turn benefited" Watkins. Hill claimed Blue's influence and involvement with the indictment process were demonstrated by Blue's two telephone conversations with Watkins before the indictments were returned and the pattern of phone calls and text messages exchanged between Blue and Watkins (and others in the DA's office) in the weeks before the indictments were returned.

We disagree with Hill's assertion that his motion and attachments demonstrate that Watkins's decision [*24] to prosecute Hill was influenced by any wrongdoing. The documents submitted with Hill's motion show that Blue represented Watkins on a pro bono matter and that she is friends with him and others in the DA's office. She testified in her deposition that she received a phone call from Watkins "shortly before the indictments came down." Her recollection of the phone call was that Watkins said "one or two sentences about the indictments," something like, "there could be an indictment or are you still interested in the indictments." She testified that she responded by telling Watkins that she did not represent the Hills and "it would be inappropriate for [her] to talk about it." Blue added that she later received another phone call from Watkins during which Watkins "mentioned the Hills." Blue reminded Watkins that she no longer represented the Hills so there was nothing she could talk about.[8] Her recollection of her response to Watkins about the indictments was affirmed by Malouf, who testified

---

[8]  In the February 12, 2013 affidavit [*25] Blue filed in support of her motion for protective order regarding the subpoena to appear at the hearing, Blue testified that after she no longer represented the Hills, she received two phone calls from Watkins wherein "at the very beginning of the conversations, District Attorney Watkins used the word 'Hill' or "Hills" (and in one of the conversations I recall he also used the word 'indictment' or 'indict')." She testified that "[o]n both occasions, [she] immediately stopped the conversation and told Mr. Watkins that [she] no longer represented [Hill or his wife] and could not talk to Mr. Watkins about the Hills."

in his deposition that he overheard Blue tell Watkins that she no longer represented the Hills, so she could not talk to him about the investigation of the Hills.

Hill maintained that Blue's testimony about the two phone calls was not credible and reflected improper communications between Watkins and his friend and political contributor. He further claimed there could be "no benign explanation" for Watkins to call Blue about the indictments or the Hills during a time when Blue was involved in a fee dispute with them. But before testifying about the phone calls, Blue also described a meeting she had with Assistant District Attorney Terri Moore when she still represented the Hills. Blue said she discussed the potential for charges against [*26] the Hills with Moore and explained that she told Moore that this "was a family fight."[9] Hill's motion does not mention this meeting.

Other than the two phones calls testified to by Blue, Hill presented nothing to show the substance of the text messages or other phone calls exchanged between Blue and Watkins in the time leading up to the indictments. Hill's arguments about their content amount to speculation. Absent evidence regarding the substances of the communications, Hill's characterization about the timing of the text messages and phone calls does not necessarily suggest the communications were related to the indictments [*27] as opposed to other legitimate purposes. Again, Hill emphasized throughout his motion that Blue had a personal and professional relationship with Watkins for many years. It is possible their communications encompassed a multitude of topics. Because of that relationship, contact with Watkins cannot be considered unusual.[10]

Similarly, other than Hill's speculation that the timing of Blue's campaign donations and fundraiser were suspect, Hill did not present any evidence that Blue's status as a political patron related to the indictments. As Hill pointed out in his motion, Blue had been a contributor and supporter of Watkins since 2007, well before her fee dispute with Hill. Hill also emphasized that Watkins announced his re-election campaign in Blue's house in November 2009. But this merely supports the fact that Blue had a long-term relationship with Watkins, not that Blue's political contributions related [*28] to the indictments. In fact, Blue's representation of the Hills in the trust litigation did not begin until November 2009. Further, Hill's accusation that Tillotson's campaign contributions in 2010 influenced Watkins's decision to prosecute Hill is not supported by any evidence.

## B. Hill's Allegation He Was Vindictively Prosecuted

Hill also sought dismissal of the indictments on the ground that the prosecution was initiated in retaliation for having exercised his right to petition the civil court in two cases: the trust litigation and the fee-dispute trial. *HN5* "Prosecutorial vindictiveness" refers to a situation in which the State acts against a defendant by bringing criminal charges "in retaliation for the defendant's exercise of his legal

---

[9] Blue testified to her meeting with Moore in her February 12 affidavit. Specifically, Blue testified that in the meeting with Moore, she recommended that the Hills not be indicted. She described Moore as "non-committal" and testified that Moore provided no response to the recommendation. Blue also testified that she first learned the DA's office was investigating the Hills by reading a May 2010 *D Magazine* article. She said she later learned about the formal complaint sent by Lynn in February 2010 and clarified that she did not participate in preparing that complaint.

[10] Hill also claimed that the communications ceased "almost completely in the days and weeks" after the indictments were publicly announced. But the phone records attached to Hill's motion end on April 30, 2011. Hill does not provide any records after that date to support this allegation.

rights." *Neal, 150 S.W.3d at 173*. A prosecutorial action is vindictive if it is designed to "penalize a defendant for invoking legally protected rights." *United States v. Meyer, 810 F.2d 1242, 1245, 258 U.S. App. D.C. 263 (D.C. Cir. 1987)*.

A defendant may demonstrate prosecutorial vindictiveness by showing actual vindictiveness, which requires him to present objective evidence of the violation. *United States v. Goodwin, 457 U.S. 368, 380-81, 102 S. Ct. 2485, 73 L. Ed. 2d 74 & n.19 (1982)*; *Neal, 150 S.W.3d at 173*; *see also United States v. Saltzman, 537 F.3d 353, 359 (5th Cir. 2008)*. Or, in certain circumstances, the defendant may rely on a presumption of vindictiveness, which requires him to present facts showing the realistic likelihood [*29] of vindictiveness, forcing the State to present objective evidence justifying the prosecutorial action. *Meyer, 810 F.2d at 1245*; *see also Neal, 150 S.W.3d at 173*; *United States v. Cooper, 461 F.3d 850, 856 (7th Cir. 2006)* (To create doubt regarding prosecutorial motivations before trial, the defendant "must affirmatively show through objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication.").[11]

In his motion, Hill argued that for a claim for vindictive prosecution, he was required to show that (1) "the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse'" and (2) "he would not have been prosecuted except for the animus." *United States v. Koh, 199 F.3d 632, 640 (2d Cir. 1999)*. Hill alleged that the decision to prosecute him was prompted by his father's anger after receiving an adverse ruling in the trust litigation and by the animus of Blue in the fee-dispute litigation. He also maintained that the

> timing, circumstances, and unusual if not unprecedented nature of the Hill indictments make abundantly clear that the real motivation of these indictments was to benefit [Watkins's] prolific campaign contributor [his father's lawyer's law partner], and to assist [Watkins's] friend and benefactor, [Blue] by impairing the Hills' ability to contest [Blue's] enormous fee claims.

He claimed such animus was demonstrated by the improprieties inherent in the indictments [*31] (such as his denial of any pre-indictment notice or opportunity to be heard by the grand jury), the "unprecedented nature" of the charges, and Hill's belief that the DA's office did not conduct a thorough investigation before indicting him.

That the decision to prosecute was prompted by his father's anger is not supported by any evidence in the record. Hill's argument speculates as to the motivations of his father's attorney in sending the DA's office the February 2010 complaint and of the timing of the law partner's donations to Watkins's

---

[11] The parties dispute whether the presumption of vindictiveness applies at this stage in the case; they argue there is a distinction drawn between pretrial and post-trial prosecutorial vindictiveness. We will assume without deciding that it does because Hill did not provide any direct proof of vindictiveness or sufficient circumstantial proof to warrant a presumption of vindictiveness. "There is no presumption of vindictiveness if in the context of the entire proceedings 'any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision . . . was motivated by some purpose other than a vindictive desire to deter or punish . . . .'" *Saltzman*, 537 F.3d at 360 (quoting *United States v. Wells*, 262 F.3d 455, 466-67 (5th Cir. 2001)). Again, even if the defendant establishes [*30] a "realistic likelihood of vindictiveness," the State "still has an opportunity to proffer legitimate, objective reasons for its conduct." *Id.* (citing *Goodwin, 457 U.S. at 374*).

campaign, but this speculation is not evidence of genuine animus. *See, e.g., United States v. Bucci, 582 F.3d 108, 114 (1st Cir. 2009)* (noting that **HN6** ″evidence of suspicious timing alone does not indicate prosecutorial animus″) (quoting *Cooper, 461 F.3d at 856*). Nor does it support an allegation that he ″would not have been prosecuted except for the animus.″ *Koh, 199 F.3d at 640*.

In addition, Hill proffered no actual evidence related to improprieties inherent in the indictments, his claim about the ″unusual″ or ″unprecedented″ nature of the charges, or his belief that the indictments were not thoroughly investigated. Hill's only attempt at proving he was denied notice of the possible charges and access to the grand jury was by attaching an unauthenticated **[\*32]** 2007 article that described the DA's office having such a policy. Hill did not present any evidence that such notice and access was actually the policy of the DA's office or its specialized crime division at the time or that notice or that grand jury access had been provided to other defendants but denied as to him. Martin, a specialized crime prosecutor, stated in her affidavit that her regular practice did not include providing notice to an accused of a contemplated charge. Further, the record showed that the Hills knew about the potential for indictments. In May 2010, while Blue still represented the Hills in the trust litigation, *D Magazine* published an article questioning whether the DA's office would go after the Hills for mortgage fraud.[12] Blue testified in her deposition that after she learned about the potential investigation, she met with Moore and recommended that the Hills not be indicted.

Although Hill alleged that Smith communicated her ″concerns″ about the **[\*33]** charges during a conversation with his counsel, he provided no evidence to show that any statements were actually made by Smith. Moreover, other evidence in the record shows that the DA's office did, in fact, investigate the allegations. For example, in seeking a continuance in the fee-dispute litigation after the indictments were returned, counsel for the Hills stated that the DA's office was producing ″thousands of pages″ of criminal discovery that needed review before the Hills could assess their position in the fee-dispute trial. In her affidavit filed with the State's response to Hill's motion, Martin also attested to the scope of her investigation, which spanned several months and included receiving documents from various sources and talking to the bank's legal counsel.

Finally, Hill claimed that the DA's office was motivated to bring charges to impair the Hills' ability to contest Blue's fee claims in the fee-dispute litigation as a way to curry favor with a political contributor. Yet the record shows that the federal judge in the fee-dispute litigation would not have been asked to draw a negative inference to the extent that the Hills were forced to invoke their Fifth Amendment privilege. **[\*34]** The federal judge also recognized that because extensive discovery including depositions had already occurred before the indictments were returned, the ″horse [was] already out of the barn.″

In short, other than Hill's belief that the DA's office served as a ″stalking horse″ for others, Hill presented no evidence to support his conclusion and could only speculate as to the nature of the mortgage-fraud charges and how the charges were investigated within the DA's office. Hill's speculation is not evidence of vindictive prosecution. *Cf. Bucci, 582 F.3d at 114* (″To obtain discovery, [the defendant] must do more than simply 'identify a potential motive for prosecutorial animus'″; ″[h]e must connect any vindictive animus to those making the challenged charging decisions in his case.″) (quoting *United States v. Sanders, 211 F.3d 711, 718 (2d Cir. 2000))*.

---

[12]   In the February 14, 2013 hearing, counsel for the Hills told the trial judge that Hill had been aware that a case had been presented to the DA's office but that Hill was unaware that the case was being taken seriously.

## C. Hill's Allegation He Was Selectively Prosecuted

Hill's third allegation was that the indictments should be dismissed because he was denied equal protection under the law when he was prosecuted under circumstances that do not normally lead to criminal prosecution and when he was denied the benefit of pre-indictment notice.

*HN7* A selective prosecution claim is an assertion that the State brought charges "for reasons forbidden by [*35] the Constitution." *Armstrong, 517 U.S. at 463-64*. A selective-prosecution claim draws on "ordinary equal protection standards" and requires a defendant to prove the existence of purposeful discrimination. *Id. at 465*; *see also Matney v. State, 99 S.W.3d 626, 628 (Tex. App.—Houston [1st Dist.] 2002, no pet.)*. To make out a prima facie case, the defendant must first show that he has been singled out for prosecution while others similarly situated and committing the same acts have not been prosecuted. *Matney, 99 S.W.3d at 628*. He must also show that the State's discriminatory selection of him for prosecution was invidious or in bad faith. *Id.*; *see also Gawlik v. State, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980)*.

Hill's allegations fail to present a prima facie case that he was selectively prosecuted. He did not present any evidence that he was singled out for prosecution under circumstances that do not normally lead to prosecution. Nor did he offer any evidence that he was treated differently because he was denied pre-indictment notice of the contemplated charges and the opportunity for his lawyer to present his views to the grand jury in contravention of what Hill claimed is the DA's office's "longstanding practice." His allegations about the DA's office's motivations for prosecuting him amount to speculation with no credible evidence to support his theories.

## V.

*HN8* There is an evidentiary [*36] threshold that must be met by the defendant before he is entitled to an evidentiary hearing on his claims that he was prosecuted in violation of his constitutional rights. *See In re United States, 397 F.3d at 284*. That burden requires a defendant to do more than make unsupported allegations or speculative inferences about an improper motive. *See Jennings, 724 F.2d at 445-46*. Stated another way, before a defendant gets to make inquiries into the State's decision to prosecute, the defendant must support his allegations with evidence that tends to establish his constitutional claims. *See id.; see also Armstrong, 517 U.S. at 468*. The record before us shows that the trial judge granted Hill an evidentiary hearing so that Hill could "try to prove" that he was prosecuted in violation of his constitutional rights. By conducting this evidentiary hearing before Hill met the evidentiary threshold, the judge turned the standard around and put the burden on the State to show why Watkins was not operating under a conflict of interest and how the prosecution of Hill was not vindictive or selective.

We conclude Hill did not make the proper showing sufficient to establish a prima face case of his alleged constitutional violations. Because Hill did not meet his burden, we also conclude the [*37] trial judge erred in conducting a hearing on Hill's motion to dismiss. Consequently, the charges against Hill should not have been dismissed. We resolve the State's second issue in its favor. Based on our resolution of the State's second issue, we need not address the State's remaining issues. *Tex. R. App. P. 47.1*.

We vacate the trial judge's order dismissing the indictments in these cases and remand the cases to the trial court with instructions to reinstate the indictments against Hill.

/Ada Brown/

ADA BROWN

JUSTICE

Bridges, J., dissenting.

Do Not Publish

*TEX. R. APP. P. 47*.

**JUDGMENT**

Based on the Court's opinion of this date, we **VACATE** the trial court's March 7, 2013 order granting Albert G. Hill III's motion to dismiss. We **REMAND** this cause to the trial court to reinstate the indictment in trial court cause number F11-00180-Q against Albert G. Hill III.

Judgment entered this 29th day of December, 2014.

**JUDGMENT**

Based on the Court's opinion of this date, we **VACATE** the trial court's March 7, 2013 order granting Albert G. Hill III's motion to dismiss. We **REMAND** this cause to the trial court to reinstate the indictment in trial court cause number F11-00182-Q against Albert G. Hill III.

Judgment entered **[*38]** this 29th day of December, 2014.

**JUDGMENT**

Based on the Court's opinion of this date, we **VACATE** the trial court's March 7, 2013 order granting Albert G. Hill III's motion to dismiss. We **REMAND** this cause to the trial court to reinstate the indictment in trial court cause number F11-00183-Q against Albert G. Hill III.

Judgment entered this 29th day of December, 2014.

**JUDGMENT**

Based on the Court's opinion of this date, we VACATE the trial court's March 7, 2013 order granting Albert G. Hill III's motion to dismiss. We REMAND this cause to the trial court to reinstate the indictment in trial court cause number F11-00191-Q against Albert G. Hill III.

Judgment entered this 29th day of December, 2014.

**Dissent by:** DAVID L. BRIDGES

## Dissent

**DISSENTING OPINION**

Dissenting Opinion by Justice Bridges

I respectfully dissent from the majority's opinion and judgment because I would conclude the trial court did not abuse its discretion in conducting a hearing on Hill's motion to dismiss and dismissing with prejudice the indictments against Hill.

No appellate court in Texas has ever ruled that a trial court erred in conducting a hearing on a defendant's motion to dismiss charges on the basis they violated his constitutional rights. **[*39]** *See, e.g., State v. Dinur, 383 S.W.3d 695, 698-99 (Tex. App.—Houston [14th Dist.] 2012, no pet.)* (trial court conducted hearing on appellant's motion to dismiss charges against him on the basis of, among other things, selective prosecution); *Rodriguez v. State, 283 S.W.3d 465, 471-72 (Tex. App.—San Antonio 2009, pet. dism'd)* (trial court conducted hearing on appellant's claim, similar to claim of selective prosecution, that trial court denied him equal protection, due process, equity, and fairness when it dismissed a virtually identical bond forfeiture case against another defendant and his surety but did not do the same for appellant); *Galvan v. State, 988 S.W.2d 291, 293 (Tex. App.—Texarkana 1999, pet. ref'd)* (trial court conducted hearing on appellant's motion to quash indictment on basis he was selectively prosecuted for bail jumping due to his race and nationality); *Amaya v. State, No. 08-11-00265-CR, 2013 Tex. App. LEXIS 12561, 2013 WL 5593110, at *7-9 (Tex. App.—El Paso Oct. 9, 2013, no pet.)* (not designated for publication) (trial court conducted pretrial hearing on appellant's motion to dismiss alleging prosecutorial vindictiveness in that prosecutor offered appellant prison time on a mandatory probation case following a motion to suppress hearing at which appellant did not prevail); *Roman v. State, No. 08-11-00057-CR, 2012 Tex. App. LEXIS 8849, 2012 WL 5287933, at *4-5 (Tex. App.—El Paso Oct. 24, 2012, no pet.)* (not designated for publication) (trial court conducted hearing on appellant's motion to quash "due to selective/vindictive prosecution" supported only by copy of information **[*40]** charging her with harassment, copy of citizen complaint form she filed against detective, and track and confirm receipt from United States Postal Service).

Under *article 28.01 of the code of criminal procedure,* a trial court may set any criminal case for a pretrial hearing at which it must determine "preliminary matters," including a claim of prosecutorial vindictiveness. *See Neal v. State, 150 S.W.3d 169, 176 (Tex. Crim. App. 2004)*. The trial court's decision to conduct an evidentiary hearing and dismiss the indictments with prejudice is reviewed for an abuse of discretion. *See State v. Terrazas, 970 S.W.2d 157, 159 (Tex. App.—El Paso 1998)*, aff'd, *4 S.W.3d 720 (Tex. Crim. App. 1999)*.

Hill's motion to quash and dismiss the indictments was based on the following facts: Hill and his father were involved in "a hotly-contested federal lawsuit involving multi-billion dollar trusts." In February 2010, the federal judge presiding over the case entered an order finding that Hill's father had testified falsely and submitted evidence in bad faith. Four days later, Hill's father, through his lawyer, submitted to the Dallas County District Attorney's Office a letter accusing Hill and his wife of mortgage fraud. In the months that followed, a law partner donated a total of $48,500 in three contributions to the re-election campaign of Dallas District Attorney Craig Watkins. No member of this firm **[*41]** had previously donated to Watkins's campaign.

In May 2010, Lisa Blue saw a magazine article raising the question of whether the district attorney's office would "go after" Hill "for shenanigans related to the house in which they live." The article described the circumstances surrounding the same $500,000 loan that had been reported to the district attorney. After Blue learned the investigation of Hill's alleged criminal conduct had been leaked to the press, she had a meeting with Terri Moore, First Assistant District Attorney at the time. Blue recommended that Hill not be indicted. Watkins was not present at the meeting.

Also in May 2010, the federal trust litigation settled. Following the settlement, Blue and her colleagues had a conflict with Hill over payment of more than $50 million in attorneys' fees attributed to Blue's six-month representation of Hill. Because of the indictments, Hill felt he could not testify and invoked his Fifth Amendment rights in the federal proceeding.

On January 20, 2011, Blue and Watkins met for dinner. Also in January 2011, while Blue was with Steve Malouf, Watkins called Blue and said, "There could be an indictment[1] or are you still interested in the indictments or . [*42] . . ." On another occasion, the date of which Blue could not remember, Watkins called Blue and again "mentioned the Hills." Blue said, "Craig, remember, I don't represent the Hills, so I can't -- there's nothing that I could talk about." Another lawyer was with Blue when she received this second call.

Blue and Watkins exchanged numerous phone calls in March 2011. On March 3, 2011, Blue met with Watkins to take publicity photos in connection with a $100,000 donation Blue made in his honor to SMU law school in 2010. On March 9, 2011, Blue had a fundraiser for Watkins at her house and contributed $5000 to Watkins. On March 22, 2011, Blue was deposed in connection with her fee dispute with Hill. On March 30, 2011, Blue and Watkins again met for dinner. On March 31, 2011, the Hills were indicted on charges of mortgage fraud. The indictments were made public two weeks before the $50 million fee dispute trial.

On October 12, 2012, approximately eighteen months after the Hills were indicted, the Hills' defense counsel met with Assistant District Attorney Deborah Smith who described a "reevaluation" [*43] of certain cases and said she had already decided to recommend dismissing certain charges against both Hill and his wife. Smith "expressed significant concerns about the cases against the Hills, made clear that she had no role in obtaining the indictments, [and] said that the interviews of witnesses she was conducting should have been conducted much earlier." Shortly after the meeting, the DA moved to dismiss all charges against Hill's wife "in the interest of justice." On October 22, 2012, in response to a follow-up email from Hill's counsel, Smith wrote that she had been reassigned to prosecute animal cruelty cases.

On February 14, 2013, the trial judge conducted a hearing on Hill's motion to dismiss. The trial judge stated she did not take her authority to dismiss a case filed by the prosecutor lightly and emphasized the limited nature of that authority. The trial judge, over the State's objection, called Blue as a witness. Blue took the stand and invoked her Fifth Amendment right on all questions.

Hill's attorney called Watkins to the stand. Counsel for the State objected on the basis of lawyer/client privilege. Specifically, counsel argued the State of Texas was represented by the district attorney, [*44] and the State therefore had a right to assert the privilege to prevent its lawyers from disclosing "any other fact which came to their knowledge by virtue of their representation of the State." Counsel for the State argued conversations between Blue and Watkins were work product because they would "reveal [Watkins's] mental impression." The trial judge instructed the State to "bring Mr. Watkins down."

An assistant district attorney entered the courtroom and stated she had spoken to Watkins, Watkins was in the office, but Watkins was not going to make himself available. The trial judge asked if Watkins

---

[1]   In 2014, the Dallas County District Attorney's website said 100,000 cases are processed per year.

was informed that the questions were going to be limited to his discussions with Blue. The assistant district attorney stated she was not aware of that and further stated she knew ″[Watkins] to be ill,″ and he was not ″in a condition to be able to testify in this matter.″ Following further discussion as to the extent of Watkins's illness and the fact that Watkins was under subpoena to testify, the trial judge granted a continuance.

On March 7, 2013, the trial judge conducted a hearing at which Blue's counsel stated Blue's position that ″she would assert her Fifth Amendment privilege today just as she [*45] had before.″ Hill called Watkins as a witness and, after a private consultation with counsel, Watkins took the stand and refused to answer any questions ″because of [his] right as an attorney to have the privilege and to protect [his] work product.″ Following a discussion of whether any privilege had been waived by providing affidavits of the people who worked for Watkins, the trial judge ordered Watkins to answer the questions. Watkins refused, and the trial judge held him in contempt.

Hill was prepared to call witnesses to testify regarding the authenticity of the exhibits attached to his motion to dismiss and certain other documents. Although it is not clear which exhibits were at issue, counsel for the State agreed he was stipulating to the authenticity of the exhibits.

Terri Moore, a former Dallas assistant district attorney, testified Donna Strittmatter and Stephanie Martin, two other assistant district attorneys, came to Moore and asked for permission to use the resources of the office to investigate Hill. Moore inquired whether Hill's father had made the allegations against him, and Strittmatter and Martin told Moore ″there was a lawsuit between the father and the son.″ Moore [*46] said, ″I'm sure dad is trying to get some kind of strategic advantage over his son in the lawsuit, so be very, very skeptical of whatever he may have told you.″ Moore added, ″Be careful, because [Hill's father] is just using the office . . . .″

Strittmatter testified she attended the pitch session at which Watkins was present. Watkins did not say anything about conversations with Blue regarding the Hills. Strittmatter testified Watkins's only involvement in preparing the case for the grand jury was that he was present at the pitch session. The pitch session was in January 2011, and the case was presented to the grand jury approximately two and a half months later.

Strittmatter testified Moore told her ″to be suspicious of the complaint″ she received from Hill's father. Strittmatter later learned the trust ″offered the bargain over a nonprosecution affidavit in this case″ so that Hill would drop his claim for the assets of the trust. In investigating the case, Strittmatter discovered the ″title agency missed something on the abstract of the property.″ When asked if she was aware whether the Dallas County District Attorney's Office had ″indicted a mortgage fraud case where the loan was [*47] fully collateralized, paid as expected, and repaid in full and there was no complaint from the bank, but it was indicted anyway,″ Strittmatter answered she ″was not aware because [she had] not been the mortgage fraud prosecutor.″ When asked the same question again, Strittmatter answered, ″I don't know, but that doesn't mean it hasn't happened.″ When the trial judge asked if there was a way to identify similar cases via computer, Strittmatter answered, ″We have a computer, but it wouldn't say that much detail, Your Honor. It'd really be the — the prosecutors' individual memory.″

Martin testified that, on February 22, 2010, Strittmatter called her into a meeting with Lynn and gave her a copy of a complaint alleging Hill had stolen from the trust ″because eighty percent of the house

was put into a mortgage." Martin denied having "concerns about a case in which the bank was not the one that complained about the alleged fraud." Martin testified Moore told her to be suspicious of Hill's father. Martin testified that, from the moment she got the complaint and reviewed the exhibits, she thought she had a good case and immediately started requesting original documents.

Martin invited Watkins [*48] to the pitch session because the case against Hill "would get some media attention, possibly national media attention." Martin testified that, if Watkins had told her "this is too much of a hot potato; let's just let it go," she would not have put the case before the grand jury.

On redirect examination, Hill's counsel showed Martin notes Martin identified as "two different days where I wrote notes about having talked to David Pickett." The first date was September 8, 2010, and noted the following:

> David Pickett calls all the time. Investigation is slowly going, and I told him that. Today he wanted a definite timeline. I told him I can't give you a timeline. I've got things to do on the case and haven't done them because I'm getting ready for trial. He said Trust is actual victim after I told him bank really isn't interested in prosecuting. Told him that in research I'd done, didn't see how I could prove his criminal case at this time. He said he sent -- gave all that stuff to me. I said I'd go back and look, but getting ready for trial. He then sends e-mail. I showed it to Chief D. Strittmatter, and then she said to show to First Assistant Terri Moore so she would have all info, if needed. [*49] Took to Terri Moore, and she said, okay, in a few weeks call him to discuss the matter.

Upon further questioning, Martin testified the bank's general counsel said "we wouldn't have filed a complaint because we -- the loan got repaid, but she would do whatever [Martin] wanted her to do as far as prosecuting the case because, by law, she has to." The trial judge, reading from Martin's notes, stated "and then it goes on to say, I've talked to David Pickett multiple times since then. He was okay with not indicting for the Trust as a victim because the bank is actual -- who was defrauded under the fraud statutes and going forward with indictments." In response to questioning, Martin testified the part of her note the trial judge read was "probably" added after Hill filed his motion to dismiss for prosecutorial misconduct.

Thus, as the trial judge summarized the situation, the pitch session was held only because the case against Hill was a potentially high publicity case; Martin invited Watkins to the pitch session and would not have gone forward with the case against Hill without Watkins's approval; the only person who could know Watkins's motivations was Watkins and, maybe, Blue; and neither [*50] Watkins nor Blue were testifying. The trial judge gave Watkins another opportunity to come down and testify and took a brief recess. When the hearing recommenced, counsel for the State told the trial judge Watkins would not testify.

Following the presentation of evidence, the trial judge made an oral finding that, "because of the failure of Mr. Watkins to testify in this hearing, the Defendant has been denied his right to have a meaningful hearing on his Motion to Dismiss." The trial judge then dismissed the cases. This appeal followed.

In its first two points of error, the State argues the trial court abused its discretion by granting Hill an evidentiary hearing and dismissing the indictments against him because (1) Hill tendered no evidence

to support his request and (2) the facts Hill alleged failed to establish a constitutional violation. Specifically, the State challenges the trial judge's decision to hold an evidentiary hearing on Hill's claims of prosecutorial misconduct in its first two issues. The State first complains about Hill's proffer of evidence in support of his motion. The State argues that Hill needed to present evidence to support his claims before he was entitled [*51] to an evidentiary hearing and, because Hill "simply made unsworn allegations" in his motion and "attached a stack of unauthenticated documents" as exhibits, he basically provided no evidence to support his central allegations. The State asserts that, under *United States v. Armstrong, 517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)*, the judge had to presume Watkins acted in good faith until Hill presented clear evidence to the contrary, and the presentation of such evidence was a condition that must be met before receiving an evidentiary hearing. The State contends that, because Hill tendered no evidence (other than some trial transcripts and deposition testimony, both of which the State argues are not clear evidence sufficient to dispel the presumption the prosecutor acted with a proper motive), the trial judge erred in conducting the evidentiary hearing. In response, Hill states the facts cast doubt on the constitutionality of the prosecution and not only entitle him to an evidentiary hearing but also establish a prima facie showing of prosecutorial misconduct.

The trial court's decision to conduct an evidentiary hearing and dismiss the indictments with prejudice is reviewed for an abuse of discretion. *See Terrazas, 970 S.W.2d at 159*. The test for whether the trial court abused its [*52] discretion is whether the action was arbitrary or unreasonable. *State v. Mechler, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005)*. The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez v. State, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)*.

Selective prosecution and vindictive prosecution are not defenses on the merits to the criminal charge but independent assertions that the prosecutor has brought the charge for reasons the Constitution prohibits. *See Armstrong, 517 U.S. at 463*; *Ex Parte Quintana, 346 S.W.3d 681, 685 (Tex. App.—El Paso 2009, pet. ref'd)*. Generally, prosecutors have broad discretion in enforcing criminal laws. *See Neal, 150 S.W.3d at 173*. But selective prosecution does limit a prosecutor's otherwise broad discretion in determining what crimes to prosecute and how. *Quintana, 346 S.W.3d at 685*; *see Roise v. State, 7 S.W.3d 225, 242-43 (Tex. App.—Austin 1999, pet. ref'd)*.

A defendant who believes he is subjected to selective prosecution bears the burden of proving purposeful discrimination. *See Green v. State, 934 S.W.2d 92, 103 (Tex. Crim. App. 1996)*. This burden falls on the defendant because the presumption is that a prosecution for a violation of a criminal law is taken upon in "good faith and in nondiscriminatory fashion" to bring violators to justice. *See Gawlik v. State, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980)*; *Garcia v. State, 172 S.W.3d 270, 273 (Tex. App.—El Paso 2005, no pet.)*. To establish a prima facie case, the defendant must show that: (1) the government has singled him out for prosecution even though the government has not proceeded against others similarly situated based on the type of conduct for which [*53] he is charged; and (2) the government's discriminatory selection is invidious, which means that the selection is based on impermissible considerations such as race, religion, or the desire to prevent his exercise of constitutional rights or based on some arbitrary classification. *Quintana, 346 S.W.3d at 685*; *Garcia, 172 S.W.3d at 273-74*. The defendant must provide "exceptionally clear" evidence that the decision to prosecute was for an improper reason to establish a prima facie case of selective prosecution. *See*

*Garcia, 172 S.W.3d at 274*. Once the defendant makes a clear showing of an Equal Protection violation, the burden shifts to the State to justify the discriminatory treatment. *See Johnson v. California, 543 U.S. 499, 505, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005)*; *Quintana, 346 S.W.3d at 685*. However, the *Equal Protection clauses of the United States* and *Texas Constitutions* only require a rational basis for the distinction unless it discriminates against a suspect class or impinges on a fundamental right. *See Flores v. State, 904 S.W.2d 129, 130 (Tex. Crim. App. 1995)*.

A constitutional claim of prosecutorial vindictiveness may be established in either of two distinct ways: (1) proof of circumstances that pose a "realistic likelihood" of such misconduct sufficient to raise a "presumption of prosecutorial vindictiveness," which the State must rebut or face dismissal of the charges; or (2) proof of "actual vindictiveness" — that is, direct evidence **[*54]** that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right. *Neal, 150 S.W.3d at 173*. Under the first prong, if the State pursues increased charges or an enhanced sentence after a defendant is convicted, exercises his legal right to appeal, and obtains a new trial, the Supreme Court has found a presumption of prosecutorial vindictiveness. *Id.* (citing *Blackledge v. Perry, 417 U.S. 21, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974))*. In the very few situations in which this presumption does apply, it can be overcome by objective evidence in the record justifying the prosecutor's action. *Id. at 173-74*.

Under the second prong, when the presumption does not apply, the defendant may still obtain relief if he can show actual vindictiveness. *Id. at 174*. To establish that claim, a defendant must prove, with objective evidence, that the prosecutor's charging decision was a "direct and unjustifiable penalty" that resulted "solely from the defendant's exercise of a protected legal right." *Id.* Under this prong, the defendant shoulders the burden of both production and persuasion, unaided by any legal presumption. *Id.* Once again, the trial judge decides the ultimate factual issue based upon the evidence and credibility determinations. **[*55]** *Id. at 174-75*. Under either prong, "[i]f the defendant is unable to prove actual vindictiveness or a realistic likelihood of vindictiveness, a trial court need not reach the issue of government justification." *Id. at 175*. That is, the State may stand mute unless and until the defendant carries his burden of proof under either prong. *Id.*

A trial judge's limited authority to dismiss an indictment stems in part from the fact that the decision of whether to prosecute is a core executive constitutional function. *Armstrong, 517 U.S. at 464-65*. And because this power is within the province of the State, the State enjoys considerable discretion in deciding whether or not to prosecute and what charge to file or bring to the grand jury. *Wayte v. United States, 470 U.S. 598, 607, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985)*; *Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978)*; *see also Neal, 150 S.W.3d at 173*. As a result of that discretion, our consideration of Hill's claims begins with a "presumption of regularity." That means we presume the State made its decision to prosecute Hill in good faith and in compliance with the Constitution. *Armstrong, 517 U.S. at 465-66*; *Neal, 150 S.W.3d at 173*.

Because courts are hesitant to interfere with the State's exercise of its discretion to prosecute, a defendant challenging the State's decision to prosecute him must make out a prima facie showing that he has been prosecuted in violation of his constitutional rights. **[*56]** *United States v. Webster, 162 F.3d 308, 333-34 (5th Cir. 1999)*. To do this, he must "dispel the presumption of good faith" and constitutional compliance by presenting "'clear evidence to the contrary.'" *Id. at 334* (quoting

*Armstrong, 517 U.S. at 465*); *see also Armstrong, 517 U.S. at 464* (because prosecutors are afforded a "background presumption," the necessary showing "to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims"); *Garcia, 172 S.W.3d at 274* (appellant "claiming selective prosecution must come forth with 'exceptionally clear evidence' that the prosecution was initiated for an improper reason.").

Importantly, a defendant who claims his constitutional rights were violated by some form of prosecutorial misconduct "is not automatically entitled to an evidentiary hearing to make the required showing." *Webster, 162 F.3d at 334*. Rather, he must "present facts 'sufficient to create a reasonable doubt about the constitutionality of [his] prosecution' . . . ." *Id.* (quoting *United States v. Jennings, 724 F.2d 436, 445-46 (5th Cir. 1986))*; *see also United States v. Cervantes, 132 F.3d 1106, 1111 n.4 (5th Cir. 1981)* (explaining that defendant is entitled to an evidentiary hearing related to constitutionality of his prosecution "only if the existing record proves the likely merit of [his] specific allegations"). The "facts" required to cast doubt about the constitutionality of the prosecution and rebut the presumption the State acted in **[*57]** good faith such that a person is entitled to an evidentiary hearing (or even discovery) must be more than allegations. *See Jennings, 724 F.2d at 445-46* (motion containing broad, generalized allegations did not offer facts to the court to warrant evidentiary hearing); *see also Wade v. United States, 504 U.S. 181, 186, 112 S. Ct. 1840, 118 L. Ed. 2d 524 (1992)* (stating that "generalized allegations of improper motive" are not enough to entitle a defendant to a remedy, discovery, or evidentiary hearing); *United States v. Sanchez, 517 F.3d 651, 671 (2d Cir. 2008)* ("Generalized allegations of improper motive do not disturb the presumption of regularity.").

A defendant also is not automatically entitled to discovery to obtain information about the prosecutorial motive; the requisite threshold to obtain discovery on such claims requires the person to produce "some evidence tending to show the existence of the essential elements" of the claimed violations. *Armstrong, 517 U.S. at 468*. The standard for obtaining discovery in aid of such claims is "rigorous" and complements the "rigorous standard" for proving constitutional violations in the decision to prosecute. *Id*.

I agree with the State's contention that a criminal defendant is not entitled to probe prosecutorial motive absent clear evidence establishing a prima facie case of a constitutional violation. *See In re United States, 397 F.3d 274, 284 (5th Cir. 2005)*. I also agree that the **[*58]** governing legal principles outlined above contemplate an initial evidentiary tender by Hill to displace the presumption the prosecutor acted in good faith. *See Armstrong, 517 U.S. at 465*; *Webster, 162 F.3d at 334*. I disagree, however, with the State's first argument that Hill provided "no evidence" with his motion in support of his claims.

Hill alleged in his motion that the influence exercised upon Watkins by Hill's father, his father's lawyer, and Blue deprived him of due process. He explained that Watkins had "a financial stake in the prosecution of the Hills" because indicting them benefited Blue (who was involved in a dispute with the Hills over attorneys' fees) and counsel for his father (who also was a major campaign contributor) "which in turn benefited" Watkins. Hill claimed Blue's influence and involvement with the indictment process were demonstrated by Blue's admission that Watkins contacted her two times before the indictments were returned and the pattern of phone calls and text messages exchanged between Blue and Watkins (and others in the DA's office) in the weeks before the indictments were returned.

In his motion, Hill argued that, to prevail on his vindictive prosecution claim, he was required to show that (1) ″the [\*59] prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse'″ and (2) ″he would not have been prosecuted except for the animus.″ _United States v. Koh, 199 F.3d 632, 640 (2d Cir. 1999)_. Hill alleged that the decision to prosecute him was prompted by the anger of his father after receiving an adverse ruling in the trust litigation and the animus of Blue in the fee-dispute litigation. He also maintained that the

> timing, circumstances, and unusual if not unprecedented nature of the Hill indictments make abundantly clear that the real motivation of these indictments was to benefit [Watkins's] prolific campaign contributor [his father's lawyer's law partner], and to assist [Watkins's] friend and benefactor, [Blue] by impairing the Hills' ability to contest [Blue's] enormous fee claims.

He claimed such animus was demonstrated by the improprieties inherent in the indictments (such as his denial of any pre-indictment notice or opportunity to be heard by the Grand Jury), the ″unprecedented nature″ of the charges, and Hill's understanding that the DA's office did not conduct a thorough investigation before indicting him. Hill's [\*60] third allegation was that the indictments should be dismissed because he was denied equal protection under the law when he was prosecuted under circumstances that do not normally lead to criminal prosecution and when he was denied the benefit of pre-indictment notice.

The State concedes Blue's deposition testimony that Watkins called her two times regarding the Hill indictments was evidence. Attached to Hill's motion to dismiss were exhibits including a complaint from Hill's father's attorney that the Hills committed mortgage fraud; excerpts from Watkins's campaign finance reports; emails between Blue, Hill, Malouf, and Charla Aldous; excerpts from Blue's deposition; and the indictments against the Hills. The record reflects that the State did not object to the numerous exhibits attached to Hill's motion to dismiss. Instead, the State filed a response to the merits of Hill's assertions contained in Hill's motion, appeared at the hearing on Hill's motion, and ended up stipulating to the authenticity of the exhibits. Further, Blue took the Fifth and refused to testify concerning her conversations with Watkins, which creates an adverse inference against the State. An adverse inference [\*61] may not be drawn from a defendant's proper invocation of a privilege because in a criminal case ″the stakes are higher and the State's sole interest is to convict.″ _Baxter v. Palmigiano, 425 U.S. 308, 318-19, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)_. However, the danger of unfair prejudice is not the same when it is the defense rather than the State that seeks to draw an inference from a witness's invocation of privilege. I would reject the State's argument, made for the first time on appeal, that the exhibits were ″no evidence,″ _see Tᴇx. R. Aᴘᴘ. P. 33.1(a)_, and overrule the State's first issue.

In its second issue, the State argues Hill failed to make a prima facie case of a constitutional violation. At the hearing on Hill's motion to dismiss, the State made this same argument. However, the State raised this issue after the hearing had begun and after the trial judge determined Hill had already established a prima facie case. A review of the record shows the first thing the trial judge did at the February 14 hearing was address the court's power to dismiss the indictments against Hill. No new evidence was presented at the February 14 hearing. In response to the State's argument that Hill

"want[ed] information" and "that's just discovery under *39.14*," the trial judge questioned how **[\*62]** Hill could "just want information" when "[Hill had] already provided, in the opinion of this Court, sufficient information." Later in the hearing, the trial judge specifically stated that "civil lawyers in a couple weeks ahead of time [of the indictments] making huge contributions to the District Attorney, and you have admissions by Ms. Blue that she discussed the indictments with Mr. Watkins" established a prima facie case to support the motion to dismiss. Another time, the trial judge stated, "This is a hearing on a motion to dismiss or a motion to quash," and Hill "presented sufficient evidence to the Court in the form of their motion to dismiss and the response . . . to the State's objections that I believe rise to the level of a prima facie showing."

Thus, the record shows the trial judge made a determination that Hill established a prima facie case before the hearing on February 14. The trial judge began the hearing by questioning the court's authority to dismiss the indictments against Hill, not by addressing the issue of whether Hill made a prima facie showing of a constitutional violation. The trial judge's references to a "hearing" to follow referred to a hearing on specific **[\*63]** issues the trial judge identified, not the issue of a prima facie case. Notably, the February 14 hearing was continued due to Watkins's refusal to appear, necessitating further "hearings" on the dismissal issue.

The gist of the allegations presented in Hill's motion is that there was an untoward interest in indicting him. He specifically claimed he was deprived of his right to a disinterested prosecutor and that he had been vindictively and selectively prosecuted. As proof of the alleged constitutional violations, Hill emphasized in his motion the following: (1) Watkins's campaign records showing political contributions from a lawyer associated with his father in the months after the February 2010 complaint and five months before the indictments were returned and a donation by Blue less than a month before the indictments; (2) information showing that Blue hosted a fundraiser for Watkins in the month before the indictments; (3) the "unusual" nature of the charges against him; (4) the lack of notice to him that indictments were being considered; (5) the suspect timing of the indictments in that they were returned just before the fee-dispute trial involving Blue, which Hill claimed prevented **[\*64]** him and his wife from testifying in that trial; (6) Blue's telephone records and text message logs, which Hill claimed show a "heated exchange" of communications with Watkins and his office in the weeks leading up to the indictments and ending after the indictments were returned; (7) Blue's admission during her depositions that she discussed indictments with Watkins in the time before they were returned; (8) Blue's comment made in her deposition that she would have no reason to discuss indictments with Watkins after they were returned; (9) Blue's close relationship with Watkins; (10) defense counsel's meeting with Smith about the charges; and (11) the fact that the charges against Hill's wife were dismissed. In addition, the trial judge heard from the district attorney's office that they did not initially think this was a good case, and the trial judge noted Martin was impeached with her own notes.

I would conclude the trial judge did not abuse her discretion in determining these facts establish a prima facie case of a selective prosecution, vindictive prosecution, and absence of an impartial and disinterested prosecutor. *See Terrazas, 970 S.W.2d at 159*. The evidence presented by Hill amounted to "more than allegations." **[\*65]** *See Jennings, 724 F.2d at 445-46*. By conducting a hearing after Hill made a prima facie case of a constitutional violation, the trial judge correctly shifted the inquiry to whether the State could produce evidence showing why the prosecution of Hill was not vindictive or selective or undertaken by an impartial and disinterested prosecutor. *See Neal, 150 S.W.3d at 173*.

Following the State's failure to present evidence from Watkins or Blue to rebut Hill's prima facie case, the trial judge did not abuse her discretion in dismissing the indictments against Hill. *Id. at 173-75*. I would overrule the State's second issue.

In its third issue, the State argues the trial judge abused her discretion by compelling Watkins to testify and then dismissing the indictments based on his refusal to testify. Specifically, the State argues Hill was attempting to "invade protected work product" by seeking to discover the basis for Watkins's decision to seek indictments against Hill.

In its response to Hill's motion to dismiss, the State asserted Hill's argument assumed the district attorney was not free to discuss these crimes or his investigation with others or, more particularly, Blue. The State argued Hill's assumption is false and argued that, even if the district **[*66]** attorney spoke to Blue about Hill's cases every single time the two communicated, there was nothing improper about it. As the county's prosecuting authority, the district attorney is obligated to investigate allegations of criminal activity and, according to the State, any source that could inform his decision about whether to prosecute and what to prosecute an individual for is fair game. The State argued it would be reasonable for the district attorney to conclude that Blue's prior relationship with Hill, which was both personal and professional, made her a potential source of reliable information.

Again, nowhere in its response did the State challenge the authenticity or veracity of any of the exhibits attached to Hill's motion to dismiss or argue that Hill's motion failed to make out a prima facie showing that he had been prosecuted in violation of his constitutional rights. Further, the record shows the State subsequently stipulated to the authenticity of the exhibits at a later hearing.

Work product comprises:

(1) material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, **[*67]** consultants, sureties, indemnitors, insurers, employees, or agents; or

(2) a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents.

Tex. R. Civ. P. 192.5. The work product of an attorney or an attorney's representative that contains the attorney's or the attorney's representative's mental impressions, opinions, conclusions, or legal theories is not discoverable. *Id.* "The primary purpose of the work product rule is to shelter the mental processes, conclusions, and legal theories of the attorney, providing a privileged area within which the lawyer can analyze and prepare his or her case." *Owens Corning Fiberglas Corp. v. Caldwell, 818 S.W.2d 749, 750 (Tex. 1991)*.

Our evidence rules provide, however, that a privilege can be waived:

A person upon whom these rules confer a privilege against disclosure waives the privilege if:

(1) the person or a predecessor of the person while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged.

*TEX. R. EVID. 511(1)*; *Jones v. State, 181 S.W.3d 875, 878 (Tex. App.—Dallas 2006, pet. ref'd)*. The State in this case did **[\*68]** not raise any privilege or work product objections during the testimony of Moore, Strittmatter, or Martin. Through their collective testimony, the State allowed extensive evidence concerning the decision-making process before and during the events leading up to Hill's indictments. Thus, any claim of privilege related to that process was waived. *See TEX. R. EVID. 511(1)*; *Jones, 181 S.W.3d at 878*.

*Rule 1.05 of the Texas Rules of Disciplinary Procedure* is pertinent to the issue of whether Watkins legitimately could solicit information from Blue concerning whether to indict Hill. *Rule 1.05* provides:

> [A] lawyer shall not knowingly . . . (2) [u]se confidential information of a client to the disadvantage of the client unless the client consents after consultation [or] (3) [u]se confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation or the confidential information has become generally known.

*TEX. DISCIPLINARY R. PROF'L CONDUCT 1.05(b)*, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (West 2005) (TEX. STATE BAR R. art. X, § 9).

One of the primary purposes of the Sixth Amendment right to counsel is to preserve the integrity of the attorney-client relationship once it has been established. *State v. Frye, 897 S.W.2d 324, 327 (Tex. Crim. App. 1995)* (citing *Patterson v. Illinois, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988))*. Both the court of **[\*69]** criminal appeals and the United States Supreme Court have declared once an accused has a lawyer, "a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Id.*

Here, Watkins's communication with Blue concerning Hill could have been a purely innocent inquiry into whether Blue, his personal friend, was simply "interested" in what was going on with Hill, in which case the inquiry would have had nothing to do with "a communication made in anticipation of litigation or for trial" and would not have constituted work product. The communication could have been an inquiry of Blue as a "potential source of reliable information" against Hill, in which case the communication would have violated *rule 1.05*. Or the communication could have been an inquiry into whether Blue, who had formerly urged the district attorney's office not to indict Hill while she represented Hill, was "still interested" in preventing the indictments now that she was seeking in excess of $50 million in attorney's fees from Hill. In that case, the characterization of Watkins's communication as "a communication made in anticipation of litigation or for trial" cannot **[\*70]** stand; the purpose of the communication in that case would be to violate Hill's constitutional rights under the guise of legitimate "prosecution." None of these possibilities support the State's theory that Watkins's communication with Blue concerning the Hill indictments fit within the definition of work product. I would overrule the State's third issue.

In its fourth issue, the State argues the trial judge abused her discretion by dismissing the indictments with prejudice. The State argues dismissal without prejudice would have cured the claimed constitutional violations.

Dismissal with prejudice may be warranted when a defendant suffers demonstrable prejudice, or a substantial threat thereof, and where the trial court is unable to "identify and neutralize the taint" by

other means. *Frye, 897 S.W.2d at 330*. Here, the evidence supported the trial judge's determination that Hill established a prima facie case his constitutional rights were violated, and the State presented no evidence enabling the trial judge to "identify and neutralize the taint." *See id*. It was for the trial judge to decide the ultimate factual issue based upon the evidence and credibility determinations. *Neal, 150 S.W.3d at 174-75*. I would conclude the trial judge **[*71]** did not abuse her discretion in dismissing the indictments with prejudice. I would overrule the State's fourth issue.

I would affirm the trial judge's order dismissing the indictments in these cases.

DAVID L. BRIDGES

JUSTICE